JUDGE KAPLAN

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

## 14 CV 3592



## COMPLAINT

CIIVIL ACTION: Case No. _____

Pro Se Litigant: Susen Gench

Susen Gench DBA

OnlineTutorForEnglish.Com
82-45 135 Street
Kew Gardens, New York 11435
http://onlinetutorforenglish.com
Telephone: 1-718-487- 9858
**(Plaintiff)**

*Against*

Hostgator.Com, LLC
5005 Mitchelldale
Suite #100
Houston, Texas 77092
http://hostgator.com
Toll Free: 1-800-964 - 2867; Local: 1-713- 574 - 5287
**(Defendant)**

Enom Incorporated
808 Lake Washington Blvd.
Kirkland, Wyoming 98033
http://enom.com
Telephone: 1-425-274-4500
**(Defendant)**

Liquid Web Incorporated
4210 S. Creyts Road
Lansing, Michigan  48917-9526
http://liquidweb.com
Toll Free: 1-800-580-4985
**(Defendant)**

1

Wired Tree

412 S. Wells St.
Floor 2
Chicago, Illinois  60607
http://wiredtree.comTT
Telephone: 312-447-0510
**(Defendant)**

SiteGap.Com; SiteGap.Net; Site Gap
**(Defendant)**
Registrar: Domains By Proxy. LLC
Compliance Department
14747 N. Northsight Blvd.
Suite 111, PMB 309
Scottsdale, Arizona 85260

# COMPLAINT

15 U.S.C. Section 1125 (a) or Lanham Act, Section 43 (a)
15 U.S.C. Section 1125 (d) or Anti-Cybersquatting Piracy Act (ACPA)
Title 17, the United States Code, Copyright of the US Code
Section 350-e of Article 22-A for Deceptive Advertising

## MOTIONS

**ORDER TO SHOW CAUSE FOR PRILIMINARY INJUNCTION:**

*Pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining the defendant, Liquid Web, Inc. during the pendency of this action from not providing access to the website of Plaintiff, http://OnlineTutorForEnglish.Com, not providing information on the server, and DNS-Domain System Record: PTR record and A record including the IP addresses.*

## SUBPOENAS

Plaintiff requests the Court issue subpoena to the parties:

1. Domains By Proxy, LLC., the registrar for SiteGap.Com or SiteGap.Net or Site Gap, who registered with this organization as an undisclosed registrant, to release the address of the defendant.

2. Enom, Inc., Plaintiff's registrar, who has blocked Plaintiff from access to her host records and password, to lift the blockage.

3. Hostgator, LLC. the web host, to release 1) the suspension notice of November 1-2, 2013; 2) the tickets for technical support.

4. Google, Inc., the publisher of Ad Words and You Tube, to release the account information of Plaintiff.

This complaint is hereby filed for an injunction, in accordance with the Section 43 of the Act (a) and Section 1125 [d]--Anti-Cybersquatting Piracy Act (ACPA), to forbid Defendants from infringing Plaintiff's trademark and pay for all damages. Plaintiff claims Defendants have infringed and diluted the trademark and service mark in violation of the Act 15 U.S.C Section 1125(a) and (d). 1) The trademark and service mark, *Online Tutor For English* and *OnlineTutorForEnglish.Com*, is valid; 2) Defendants registered the Top Level Domain (TLD) in bad faith in order to profit from the mark; 3) the domain was distinctive when Defendants registered the domain; 4) The domain and its TLD versions Defendants have advertised are identical or confusingly similar. For the injunction, Plaintiff seeks the remedies spelled out in this complaint but not limited to, along with monetary and all applicable awards.

Under 15 U.S.C. Section 1125 (a), Defendants are liable for false designations of origin, false descriptions and dilution of Plaintiff's mark, *Online Tutor For English*, and the TLD, *OnlineTutorForEnglish.Com*.

Plaintiff seeks the court consider factors such as, but not limited to:
Under 15 U.S.C. Section 1125 (d) (1) (A), Defendants have had bad faith intent to profit from the mark and registered, trafficked, and used her TLD. Title 17, Copyright of the US Code, under which Plaintiff holds intellectual property rights to the mark.

# FACTUAL HISTORY

I. **15 U.S.C. Section 43 the Lanham Act: The trademark or service mark of Plaintiff is valid**

The TLD, *OnlineTutorForEnglish.Com*, is the legal name of Plaintiff. The name and designation of *Online Tutor For English*, is a valid mark registered as a United States organization in the City of New York-Queens County (Exhibit 1).

On September 12, 2007 Plaintiff registered her domain with Tucows (Exhibit 2).

Plaintiff advertised her Top Level Domain or TLD, *OnlineTutorForEnglish.Com*, with Google ad Words Yahoo, Linked In, and others, who verified Plaintiff several times at the same address where Plaintiff is registered (Exhibit 3).

Plaintiff published articles on established US sites under the owner title of *OnlineTutorForEnglish.Com* (Exhibit 4).

Plaintiff has produced video content of which 96 videos are currently published in You Tube since 2009. This exhibit displays Plaintiff's mark, *Online Tutor For English*, and her Google Gmail account with her signature (sg*ench@onlinetutorforenglish.com*) Sue Gench, she logged on from her own computer (Exhibit 5).

4

Plaintiff has produced content and uploaded it to the TLD, *OnlineTutorForEnglish.Com,* from her computers since September 2006 that are available at *http://www.onlinetutoforenglish.com* (Exhibit 6).

Plaintiff has registered her website content with the United States Copyright Office. Currently her content is published at the aforementioned URL--Uniform Resource Locator (URL), or website address: *http://OnlineTutorForEnglish.Com* (Exhibit 7).

Plaintiff has served to site users from the live-chat console installed on her computer for several years at the same address as she registered her mark and TLD domain from a console of instant online help via a live chat tool that is installed on her computer and accessible to visitors on site pages (Exhibit 8).

**(II) Defendants have had bad faith in order to profit from the mark:**

**1. 15 U.S.C. S.1125 (d) (1) (B) (i) (VII): Defendants' with intentional failure, have not maintained accurate Who Is records**

On January 7, 2011 Plaintiff bought a *Business Plan* from Hostgator and terminated with Hostgator on September 7, 2013 (Exhibit 9).

On September 9, 2011 Plaintiff transferred her domain, *OnlineTutorForEnglish.Com*, to Enom (Exhibit 10).

On March 3, 2012 Plaintiff transferred to Hostgator, an Enom reseller, and paid Defendant for domain registration (Exhibit 11).

Nevertheless, in the face of failing services of Hostgator, Plaintiff ordered to transfer back to Enom but Defendants dragged it; never completed the transfer (Exhibit 12). Instead, Hostgator transferred it back to themselves (Adam Farrar), falsified the administrative and technical contact, Plaintiff discovered recently (Exhibit 13).

Who Is lookup inquiries showed Hostgator held Plaintiff's domain until December 30, 2013 (Exhibit 14).

15 US Code, Section 1125 (d) (1) (A) (I) (ii) (B) (V) (VII): Giving access to unauthorized third-party registrants but blocking Plaintiff from full access to her password and records, Enom has violated the ICANN compliance agreement and ACPA. Plaintiff notified Enom with a legal notice in order for Defendant to take necessary action but Defendant failed to do so (Exhibit 15).

Enom responded ten days after Plaintiff served the legal notice, with an email in which Defendant dodged her per item demand, as it follows:

Enom didn't lift the blockage for Plaintiff to be able to change her password. Every time Plaintiff attempted to log in her account to change the password but was

unable to do so, Enom sent the domain transfer key (EPP) to her. *contact@onlinetutorforenglish.com* address, recklessly exposing Plaintiff to more abuse on the *WebsiteWelcome.Com* email server to whom her email client is still connected, in order to rid the responsibility. This way, Enom exhibited bad faith intent to allow unauthorized transfers.

(1) (A) (i) (I): Enom shrugged off the responsibility for subjecting Plaintiff to unauthorized transfers. Further, Enom stated the "company" who holds the name servers supersedes the right of Plaintiff to access to the host records, given that Plaintiff holds her name servers as the owner of the domain, who has registered it several years lawfully. Does that mean Enom knows unauthorized registrants holding her private name servers? Enom acted in bad faith in violation of the ACPA with the adamant blockage against her access (Exhibit 16).

**2. 15 US Code, Section 1125( d) (1) (A) (I) (ii) (B) (i) (VI): Defendants diverted Plaintiff's traffic and content to third parties for commercial gain and with an intent for infringing content for commercial benefit** by creating of confusion as to source, sponsorship or affiliation, or endorsement of the site.

On January 8, 2011 Plaintiff bought a web hosting *Business Plan* from Hostgator for $15 a month on the shared server where Defendant hosted millions of domains for $3.76-3.94 (Exhibit 17).

Plaintiff paid this price for a dedicated IP address which would reverse to her domain, *OnlineTutorForEnglish.Com*, meaning that no other domains would be hosted in the same IP. Hostgator never provided a dedicated IP, resulting in a calamity of successive infringing that brought down her domain and site until she complained to the Better Business Bureau (BBB).

(1) (B) (V): On September 9, 2011 Plaintiff complained that her site was uploaded to a domain under the name, *http://50.22.194.100-static-reverse.softlayer.com*, a mask shielding the host(s) where *WebsiteWelcome.Com*, the Hostgator bulk email vendor, has operated. Upon her complaint, Hostgator, first, contrived that this mask domain was another representation of Plaintiff, *OnlineTutorForEnglish.Com*, which couldn't be possible as no substitutes can replace a TLD domain operating simultaneously in different locations under the ICANN rules, who redirected her domain and content to other hosts in bad faith intent (Exhibit 18).

## IP ADDRESS IN THE DNS RECORD

The set of digits above in the domain (50.22.194.100) refers to an IP address of the host holding this domain on Softlayer servers where Hostgator had their data centers. This numerical digit set is integrated into the DNS--Domain Name System, which converts user-friendly domain names, such as *OnlineTutorForEnglish.Com*, into numerical addresses that allow computers to talk to each other. Without DNS operated

by internet service providers, computer users would not be able to browse websites or send e-mail. Basically, the IP address what the computer understands of a domain name in numbers but not in human language. At the user-end the domain name represents the same entity in human language, and the translator between these two-end operators is the Internet Protocol that performs this translation. As soon as a domain name (*onlinetutorforenglish.com*) entered into the Internet browser, the Internet Protocol requests where the IP address resides in the Domain Name Servers that serve DNS lookups within various zones of the domain by using the IP address. Two types of name servers pointing to 2 IP addresses must be declared through this record: Primary Name Server or A Record; and Secondary Name Server or PTR: see Page 14.

If these name servers don't exist or are changed without authorization, then internet users experience problems, for example, the domain name becomes inaccessible or another domain name returns the request, which is one damage Plaintiff claims. Defendants transferred Plaintiff without authorization and then uploaded her content to *http://50.22.194.100-static.reverse.com*. Because DNS Changer (a program that redirects an unsuspected user to rogue servers controlled by cyber criminals, allowing them to manipulate users' web activity. When users of infected computers clicked on the link for *http://onlinetutorforenglish.com*, they were taken instead to a website *(http://50.22.194.100-static.reverse.softlayer.com)*, unaffiliated with *OnlineTutorForEnglish.Com*. This way the criminals must have made money from this scheme depriving *OnlineTutorForEnglish.Com* of revenue. Plaintiff complained to the BBB, including the pages uploaded to the aforementioned mask (Exhibit 19).

### (1) (A) (I) (ii) (B) (i) (VI): Defendants hijacked Plaintiff's domain

First, by depriving Plaintiff of a dedicated IP and then by falsifying the Domain Name System (DNS) record, Hostgator hijacked her domain through social engineering or impersonation--replacing Plaintiff's name and address with the Hostgator CEO, Adam Farrar. Then Defendant infringed her content by uploading it to the aforementioned mask domain whose hosts are shielded. With the conspiracy of Enom who a) helped to falsify the domain transfer; b) blocked Plaintiff from access to host records so Hostgator, an Enom reseller, has been able to preserve the registrar status as of December 31, 2013. By blocking Plaintiff, Enom has concealed this information from Plaintiff, all in bad faith for financial gain.

On October 3, 2012 Plaintiff complained to Hostgator that her name servers pointed to *Softlayer.Com* and, in response, Defendant indicated this condition would be corrected within 24 hours but it was not (Exhibit 20).

On December 22, 2012 Plaintiff filed a complaint with the BBB-Better Business Bureau, demanding Defendant remove her content from the aforementioned mask domain. Defendant offered refund in return for her to remove her site but Plaintiff rejected it on the ground that, first, the extent of damage was too great to migrate to another host smoothly. Second, the compensation offered was incomparable to the damage her domain and site were subjected to. As she stated to the BBB, Plaintiff lost

her traffic and search engine rankings and, as a result, her revenue. Therefore, instead of removing her site, Plaintiff requested Defendant take action to bring her site back to where it was before in terms of traffic and Google Page Rank. The extent of the problems she reported to the BBB was what she knew until recently. She absolutely had no knowledge until November 1, 2013 that her domain was hijacked (Exhibit 21).

On September 7, 2013, faced with another sudden drop in traffic, Plaintiff reported to Defendant for help but didn't get it, and then she terminated with Defendant to move her site to In Motion Hosting temporarily (Exhibit 22).

On November 1, 2013 Plaintiff bought a dedicated server from Liquid Web to host her domain but got suspended when she attempted to update her name servers because Who is showed *OnlineTutorForEnglish.Com* still pointed to *50.22.194.100-static-everse.softlayer.com*, even though the last host was In Motion Hosting--before Liquid Web--to whom her domain should have pointed to, showing Hostgator still held her domain (Exhibit 23).

With the aforementioned suspension, the Plaintiff discovered Hostgator and Enom never performed the transfer procedure she ordered in September 2012. Liquid Web stated that the suspension was triggered automatically in the Who Is registry as a result of the missing A Record, meaning that the Primary Name Server IP for the DNS *record of OnlineTutorForEnglish.Com* didn't exist. The Start-Of-Authority--SOA showed Hostgator was still the owner as well as an IP address of *WebsiteWelcome.Com* (92.185.64.223) in the Answer Section mapped to Plaintiff (Exhibit 24).

As for the above SOA record pertaining to the IP of Website Welcome, Liquid Web emphatically denied *OnlineTutorForEnglish.Com* didn't point to *WebsiteWelcome.Com* which was utterly a misrepresentation Plaintiff had to confront in the tickets (Exhibit 25).

## 2. 15 U.S.C. Section.1125 (d) (B) (i) (III) (IV) (V): Defendants have not established evidence of prior lawful use

Defendants have established disingenuous websites for TLD versions of Plaintiff but established no evidence of prior lawful use. Simply establishing a web site, if the actual intent is to sell, will not avoid Defendants a bad faith determination for cyber-squatting. *Name.Com*, a *Demand Media* company who also owns Enom, has offered to sell a misspelled version of her TLD, *OnlineTutorForEnglish.Com*, without having used, or having an intent to use, in the bona fide offering of goods or services, or a prior pattern of such conduct (Exhibit 26).

Enom has advertised this misspelled version as well (Exhibit 27).

**15 U.S.C. Section 1125-d (1) (A) (ii) (I): Defendants have trafficked from Plaintiff**

**Defendants diverted Plaintiff's traffic:**

Hostgator has diverted Plaintiff's emails to the aforementioned mask domain where the Hostgator bulk email operation of *WebsiteWelcome.Com* is hosted, since January 2011 for over three years. Moreover, this exhibit shows how Plaintiff is being hijacked by Wired Tree mapping her to *SiteGap.Com*; then Hostgator to *WebsiteWelcome.Com*, and Liquid Web to Wired Tree-Site Gap (Exhibit 28).

Defendants forged the MX-Email Exchange protocol, an integral part of the DNS, by redirecting *OnlineTutorForEnglish.Com* to the aforementioned mask or *WebSiteWelcome.Com* and, as a result, Plaintiff has lost email addresses of all her clients to Defendant. The Exhibit shows a letter the plaintiff attempted to send her clients but didn't arrive at their destinations because Defendant altered her clients' email addresses to *@WebsiteWelcome.Com*, in order to mislead the recipient about the origin of the message (Exhibit 29).

**Defendant subjected Plaintiff to pernicious spam:**

In order to maximize revenue, Hostgator has provided all customers the same cPanel-- a graphics interface installed on servers for end-users to manage routine tasks--including login, regardless of the product purchased, whether it's a $15 or $3.74-3.96 plan. With millions of clients accessing the server from this same cPanel, Defendant has monetized this expediency at the expense of Plaintiff. Defendant placed their advertisements on cPanel. Over-sized ad banners and thumbnail hyper-links invited more abuse, putting the plaintiff in more harm ways.

In September 2012, the plaintiff received a complaint notice from a client for a sale Plaintiff never received the initial sale receipt. Defendant refused to disclose the culprit to Plaintiff (Exhibit 30).

In September 2012, in order to protect the site from spam, Plaintiff removed all social media buttons, such as Facebook, Twitter and Linked In, a choice she had to make, leaving only one site banner and text-link menus against a white-color background with lots of free space on the web pages, at the expense of losing social media promotion (Exhibit 31).

In February 2012, the visitors number reached 32,203 (Exhibit 32);

In March 2012, the traffic began falling; it dropped to 28,792 (Exhibit 33);

In April it dropped drastically to 17,094 (Exhibit 34);

In May it 2012 the traffic plummeted over 75 percent to 6,945 (Exhibit 35);

In December 2012 it hit the bottom at 4,677(Exhibit 36).

Left with no support from Defendant, Plaintiff earnestly tried a dedicated server hosting option for which Defendant provided insufficient information on tech support (Exhibit 37).

In August 2013 Plaintiff reported to Hostgator IP addresses of more mask domains of *static-reverse.softlayer.com* coming into her site but got no attention from Defendant (Exhibit 38).

### 3. 15 U.S.C. Section 1125(d) (1) (B) (i) (I): No trademark or intellectual property rights Defendants have to the TLD

Plaintiff has intellectual property rights to the TLD, *OnlineTutorForEnglish.Com*. The mark is the legal name of Plaintiff. She has created and used the site, and produced its content since its inception of September 2006 as of the present. Plaintiff owns the mark: *Online Tutor For English*; and the domain name: *OnlineTutorForEnglish.Com.* To the contrary, this domain name is not the legal name of Defendants. They had no prior use of the domain in connection with the good faith offering of goods and services. Plaintiff is registered with the United States Copy Right Office. All pages appearing on the site currently are copyrighted as referenced in Exhibit 7.

### (III) 15 U.S.C. Section 1125 (d) (1) (A) (I) (ii) (I): The mark was distinctive at the time of domain registration by Defendants under

Plaintiff transferred her domain to Enom on September 12, 2011 and to Hostgator on February 20, 2012, when Plaintiff was already a distinctive mark in the United States serving a large geographic location. Since September 2006 *Online Tutor For English* has offered American native tutors whose English is their first language and who reside in the United States, along with online English tutorials delivered to clients' email boxes, and English learning resources: conversations lessons, writing lessons, vocabulary enrichment, and articles published at *http://www.onlinetutorforenglish.com*, in a total of 750 pages submitted to Google and the United States Copyright Office.

Plaintiff has built an organic traffic (excluding advertisement) that reached 32,203 monthly visits in February 2012. Within the scope of similar sites offering online English tutoring, this traffic is considered to be solid good, which started bringing income to Plaintiff from advertisement, tutorial purchases, and online tutoring. Google ranked the site on top of first page search results for its resourceful content aimed at adults, college and high school students, for several years.

### (IV) 15 U.S.C. Section 1125 (d) (1) (B) (i) (VIII): Defendants have advertised identical or confusingly similar versions

Defendants created websites identical or confusingly similar to the TLD, *OnlineTutorForEnglish.Com*, that harmed the goodwill represented by the mark, either

for commercial gain or with the intent to tarnish or disparage the mark by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

What's known to be true to Plaintiff is that Defendants have advertised misspelled version(s), as in OnlineTutorsForEnglsh.Com, under various holders without an accurate address, currently by *Name.Com*, an Enom-owned bulk domain retailer. Defendants registered this misspelled version.

Similarly, OnlineTutorsForEnglish.Com, OnlineTutorsForEnglish.Net versions with an 's' addition to *OnlineTutorForEnglish.Com*, Defendants offered to sell (Exhibit 39).

In addition, Defendants warehoused multiple domain names known to be identical or confusingly similar, diluted the mark to initiate or offer to sell. Sitting on such marks is sufficient evidence of bad faith and an offer to sell is not required. *Name.Com*, a Demand Media company who owns Enom, has offered to sell identical TLD's with extensions such as

OnlineTutorForEnglish.org (Exhibit 40);
OnlineTutorForEnglish.net (Exhibit 41);
OnlineTutorForEnglish.info (Exhibit 42
OnlineTutorForEnglish.biz (Exhibit 43);
OnlineTutorForEnglish.us (Exhibit 44);
OnlineTutorForEnglish.mobi (Exhibit 45);
OnlineTutorForEnglish.co (Exhibit 46);

(1) (A) (i) (ii) (I):  These TLD's and many more identical or confusingly similar versions were displayed on the Enom websites (*http://who.is/; http://name.com*) daily, to benefit from her mark, *OnlineTutorForEnglish.Com*, that is a distinctive mark at the time of offer to sell such domains and that Plaintiff owns the mark.

## 4. 15 US Code, Section 1125 (d); Title 17 US Code, Copyright of the US Code: Defendants infringed Plaintiff's domain and content

Plaintiff has never purchased or registered the mask: *50.22.194.100-static.reverse.softlayer.com*. On the other hand, Hosgator, who has operated their data center with Softlayer, hijacked her domain. First Defendant mapped Plaintiff to the above IP of their bulk-email operation *(WebsiteWelcome.Com)* and then uploaded her content to it. Defendant is a bulk email vendor; sells *static-reverse.sofylayer.com* masked domains to advertisers that shield themselves from liability for spam.

Plaintiff complained to Defendant that the mask domain never reversed to Plaintiff, *OnlineTutorForEnglish.Com*, making it possible for criminal host(s) to steal the site content, Google page rank and sell them in the black market, as well as divert Google Ad Sense earnings to themselves. Discovering her site and content at different locations, Google has severely demoted her page rank from 4-3 to 2-0, leading Plaintiff to terminate her Ad Sense Publisher account in 2012 she opened in 2010.

**Section 350-e of Article 22-A for Deceptive Advertising: Defendant failed to provide the product as advertised**

Plaintiff bought the *Business Plan* from Hostgator for features: dedicated IP; unlimited bandwidth, 24/7 technical support, as advertised on the Defendant site.

Defendant has failed to provide these features reasonably well, and, regarding the dedicated IP, provided none. A dedicated IP refers to an IP address mapped only to one single domain and that domain reverses to it, and vice versa, strengthening its integrity in terms of ownership, location and contact information. In other words, a dedicated IP address reinforces protection against unauthorized transfers, which is a severe consequence Plaintiff suffered, lacking it. Defendant, who charged Plaintiff for dedicated IP, didn't provide it. Plaintiff paid Defendant $15 a month for this feature on a shared server, who sold the same product for $3.79-3-96 to millions of others, readily exposing Plaintiff to abuse.

As for the unlimited bandwidth, Plaintiff used minimal resources, about 1.5 - 2 gig byte a month, which is minimal considering 1 tera--1000 gig bytes average usage for small business websites. Her unused bandwidth was given away to other hosts on the same server crowding her space that slowed down her site, otherwise she would have never endured downtime to this extent.

Defendant showed bad faith about the downtime consequences to Plaintiff. While the server was down, Defendant had simply didn't notify Plaintiff. Without an advance notice from Defendant, the site being down several hours and days, cost dearly to Plaintiff. Her site suffered from outdated pages laying around on the server several days, with hacked pages whose information was altered but Defendant provided no backup. To cite severe breakouts, one took place on September 29th through October 4th, 2012 the DNS--Domain Name Server, was inaccessible. Google reported the downtime of the September 29th with the traffic dipped to 148 visitors on this day ((Exhibit 47).

In September 2012, when the downtime was over 17 hours, Defendant never notified Plaintiff (Exhibit 48).

On October 1, 2013, with the site inaccessible several hours without a notice from Defendant, Plaintiff asked for information (Exhibit 49).

Defendant responded very slowly to problems reported through tickets or emails or telephone calls. Defendant sent automatic email replies to tickets and after several hours--usually 24 hours, the tickets got replied.

On phone calls, a recorded message greeted the customer with an announcement that, for improving tech support, the conversation would be recorded and, at the end, there would be a brief survey for the customer to rate the tech support.