# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

*Amended*

## COMPLAINT

CIIVIL ACTION: Case No. *14CV-3592*

Pro Se Litigant: Susen Gench

---

Susen Gench DBA
OnlineTutorForEnglish.Com
82-45 135 Street
Kew Gardens, New York 11435
http://onlinetutorforenglish.com
Telephone: 1-718-487- 9858
**(Plaintiff)**

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #:_____
> DATE FILED: *5/23/14*

*Against*

Hostgator.Com, LLC
5005 Mitchelldale
Suite #100
Houston, Texas 77092
http://hostgator.com
Toll Free: 1-800-964 - 2867; Local: 1-713- 574 - 5287
**(Defendant)**

Enom Incorporated
Demand Media
121 East 24th Street, 2nd Floor
New York, New York 10010
http://demandmedia.com
Telephone: 212-364-6200
**(Defendant)**

Liquid Web Incorporated
4210 S. Creyts Road
Lansing, Michigan  48917-9526
http://liquidweb.com
Toll Free: 1-800-580-4985
**(Defendant)**

1

Wired Tree

412 S. Wells St.
Floor 2
Chicago, Illinois  60607
http://wiredtree.comTT
Telephone: 312-447-0510
**(Defendant)**

SiteGap.Com; SiteGap.Net; Site Gap
**(Defendant)**
Registrar: Domains By Proxy. LLC
Compliance Department
14747 N. Northsight Blvd.
Suite 111, PMB 309
Scottsdale, Arizona 85260

## COMPLAINT

15 US Code, Section 1125 (a) or Lanham Act, Section 43 (a)
15 U.S.C. Section 1125 (d) or Anti-Cybersquatting Piracy Act (ACPA)
Title 17, the United States Code, Copyright of the US Code
Section 350-e of Article 22-A for Deceptive Advertising

## MOTIONS

### ORDER TO SHOW CAUSE FOR PRILIMINARY INJUNCTION:

*Pursuant to Rule 65 of the Federal Rules of Civil Procedure enjoining the defendant, Liquid Web, Inc. during the pendency of this action from not providing access to the website of Plaintiff, http://OnlineTutorForEnglish.Com, not providing information on the server, and DNS-Domain System Record: PTR record and A record including the IP addresses.*

## SUBPOENAS

Plaintiff requests the Court issue subpoena to the parties:

1. Domains By Proxy, LLC., the registrar for SiteGap.Com or SiteGap.Net or Site Gap, who registered with this organization as an undisclosed registrant, to release the address of the defendant.

2. Enom, Inc., Plaintiff's registrar, who has blocked Plaintiff from access to her host records and password, to lift the blockage.                    `Comn`

3. Hostgator, LLC. the web host, to release 1) the suspension notice of November 1-2, 2013; 2) the tickets for technical support.

4. Google, Inc., the publisher of Ad Words and You Tube, to release the account information of Plaintiff.

This complaint is hereby filed for an injunction, in accordance with the Section 43 of the Act (a) and Section 1125 [d]--Anti-Cybersquatting Piracy Act (ACPA), to forbid Defendants from infringing Plaintiff's trademark and pay for all damages. Plaintiff claims Defendants have infringed and diluted the trademark and service mark in violation of the Act 15 U.S.C Section 1125(a) and (d). 1) The trademark and service mark, *Online Tutor For English* and *OnlineTutorForEnglish.Com*, is valid; 2) Defendants registered the Top Level Domain (TLD) in bad faith in order to profit from the mark; 3) the domain was distinctive when Defendants registered the domain; 4) The domain and its TLD versions Defendants have advertised are identical or confusingly similar. For the injunction, Plaintiff seeks the remedies spelled out in this complaint but not limited to, along with monetary and all applicable awards.

Under 15 US Code, Section 1125 (a), Defendants are liable for false designations of origin, false descriptions and dilution of Plaintiff's mark, *Online Tutor For English*, and the TLD, *OnlineTutorForEnglish.Com*.

Plaintiff seeks the court consider factors such as, but not limited to: Under 15 U.S.C. Section 1125 (d) (1) (A), Defendants have had bad faith intent to profit from the mark and registered, trafficked, and used her TLD. Title 17, Copyright of the US Code, under which Plaintiff holds intellectual property rights to the mark.

## FACTUAL HISTORY

**(I) 15 US Code, Section 43, The Lanham Act: The trademark or service mark of Plaintiff is valid:**

The TLD, *OnlineTutorForEnglish.Com*, is the legal name of Plaintiff. The name and designation of *Online Tutor For English*, is a valid mark registered as a United States organization in the City of New York-Queens County (Exhibit 1).

On September 12, 2007 Plaintiff registered her domain with Tucows (Exhibit 2).

Plaintiff advertised her Top Level Domain or TLD, *OnlineTutorForEnglish.Com*, with Google ad Words Yahoo, Linked In, and others, who verified Plaintiff several times at the same address where Plaintiff is registered (Exhibit 3).

Plaintiff published articles on established US sites under the owner title of *OnlineTutorForEnglish.Com* (Exhibit 4).

Plaintiff has produced video content of which 96 videos are currently published in You Tube since 2009. This exhibit displays Plaintiff's mark, *Online Tutor For English*, and her Google Gmail account with her signature (*sgench@onlinetutorforenglish.com*) Sue Gench, she logged on from her own computer (Exhibit 5).

Plaintiff has produced content and uploaded it to the TLD, *OnlineTutorForEnglish.Com,* from her computers since September 2006 that are available at *http://www.onlinetutoforenglish.com* (Exhibit 6).

Plaintiff has registered her website content with the United States Copyright Office. Currently her content is published at the aforementioned URL--Uniform Resource Locator (URL), or website address: *http://OnlineTutorForEnglish.Com* (Exhibit 7).

Plaintiff has served to site users from the live-chat console installed on her computer for several years at the same address as she registered her mark and TLD domain from a console of instant online help via a live chat tool that is installed on her computer and accessible to visitors on site pages (Exhibit 8).

**(II) Defendants have had bad faith in order to profit from the mark:**

**1. 15 US Code. Section 1125 (d) (1) (B) (i) (VII): Defendants' with intentional failure, have not maintained accurate Who Is records**

On January 7, 2011 Plaintiff bought a *Business Plan* from Hostgator and terminated with Hostgator on September 7, 2013 (Exhibit 9).

On September 9, 2011 Plaintiff transferred her domain, *OnlineTutorForEnglish.Com*, to Enom (Exhibit 10).

On March 3, 2012 Plaintiff transferred to Hostgator, an Enom reseller, and paid Defendant for domain registration (Exhibit 11).

Nevertheless, in the face of failing services of Hostgator, Plaintiff ordered to transfer back to Enom but Defendants dragged it; never completed the transfer (Exhibit 12). Instead, Hostgator transferred it back to themselves (Adam Farrar), falsified the administrative and technical contact, Plaintiff discovered recently (Exhibit 13).

Who Is lookup inquiries showed Hostgator held Plaintiff's domain until December 30, 2013 (Exhibit 14).

15 US Code, Section 1125 (d) (1) (A) (I) (ii) (B) (V) (VII): Giving access to unauthorized third-party registrants but blocking Plaintiff from full access to her password and records, Enom has violated the compliance agreement of ICANN or the Internet Corporation for Assigned Names and Numbers, and ACPA. Plaintiff notified Enom with a legal notice in order for Defendant to take necessary action but Defendant failed to do so (Exhibit 15).

Enom responded ten days after Plaintiff served the legal notice, with an email in which Defendant dodged her per item demand, as it follows:

Enom didn't lift the blockage for Plaintiff to be able to change her password.

Every time Plaintiff attempted to log in her account to change the password but was unable to do so, Enom sent the domain transfer key (EPP) to her. *contact@onlinetutorforenglish.com* address, recklessly exposing Plaintiff to more abuse on the *WebsiteWelcome.Com* email server to whom her email client is still connected, in order to rid the responsibility. This way, Enom exhibited bad faith intent to allow unauthorized transfers.

**(d) (1) (A) (i) (I):** Enom shrugged off the responsibility for subjecting Plaintiff to unauthorized transfers. Further, Enom stated the "company" who holds the name servers supersedes the right of Plaintiff to access to the host records, given that Plaintiff holds her name servers as the owner of the domain, who has registered it several years lawfully. Does that mean Enom knows unauthorized registrants holding her private name servers? Enom acted in bad faith in violation of the ACPA with the adamant blockage against Plaintiff's access (Exhibit 16).

**2. 15 US Code, Section 1125 (d) (1) (A) (I) (ii) (B) (i) (VI): Defendants diverted Plaintiff's traffic and content to third parties for commercial gain and with an intent for infringing content for commercial benefit** by creating of confusion as to source, sponsorship or affiliation, or endorsement of the site.

On January 8, 2011 Plaintiff bought a web hosting *Business Plan* from Hostgator for $15 a month on the shared server where Defendant hosted millions of domains for $3.76-3.94 (Exhibit 17).

Plaintiff paid this price for a dedicated IP address which would reverse to her domain, *OnlineTutorForEnglish.Com*, meaning that no other domains would be hosted in the same IP. Hostgator never provided a dedicated IP, resulting in a calamity of successive infringing that brought down her domain and site until she complained to the Better Business Bureau (BBB).

**(1) (B) (V):** On September 9, 2011 Plaintiff complained that her site was uploaded to a domain under the name, *http://50.22.194.100-static-reverse.softlayer.com*, a mask shielding the host(s) where *WebsiteWelcome.Com*, the Hostgator bulk email vendor, has operated. Upon her complaint, Hostgator, first, contrived that this mask domain was another representation of Plaintiff, *OnlineTutorForEnglish.Com*, which couldn't be possible as no substitutes can replace a TLD domain operating simultaneously in different locations under the ICANN rules, who redirected her domain and content to other hosts in bad faith intent (Exhibit 18).

## IP ADDRESS IN THE DNS RECORD

The set of digits above in the domain (50.22.194.100) refers to an IP address of the host holding this domain on Softlayer servers where Hostgator had their data centers. This numerical digit set is integrated into the DNS--Domain Name System, which converts user-friendly domain names, such as *OnlineTutorForEnglish.Com*, into

numerical addresses that allow computers to talk to each other. Without DNS operated by internet service providers, computer users would not be able to browse websites or send e-mail. Basically, the IP address what the computer understands of a domain name in numbers but not in human language. At the user-end the domain name represents the same entity in human language, and the translator between these two-end operators is the Internet Protocol that performs this translation. As soon as a domain name (*onlinetutorforenglish.com*) entered into the Internet browser, the Internet Protocol requests where the IP address resides in the Domain Name Servers that serve DNS lookups within various zones or the domain by using the IP address: see Page 14.

If these name servers don't exist or are changed without authorization, then internet users experience problems, for example, the domain name becomes inaccessible or another domain name returns the request, which is one damage Plaintiff claims. Defendants transferred Plaintiff without authorization and then uploaded her content to *http://50.22.194.100-static.reverse.com*. Because DNS Changer (a program that redirects an unsuspected user to rogue servers controlled by cyber criminals, allowing them to manipulate users' web activity. When users of infected computers clicked on the link for *http://onlinetutorforenglish.com*, they were taken instead to a website *(http://50.22.194.100-static.reverse.softlayer.com)*, unaffiliated with *OnlineTutorForEnglish.Com*. This way the criminals must have made money from this scheme depriving *OnlineTutorForEnglish.Com* of revenue. Plaintiff complained to the BBB, including the pages uploaded to the aforementioned mask (Exhibit 19).

### (d) (1) (A) (I) (ii) (B) (i) (VI): Defendants hijacked Plaintiff's domain

First, by depriving Plaintiff of a dedicated IP and then by falsifying the Domain Name System (DNS) record, Hostgator hijacked her domain through social engineering or impersonation--replacing Plaintiff's name and address with the Hostgator CEO, Adam Farrar. Then Defendant infringed her content by uploading it to the aforementioned mask domain whose hosts are shielded. With the conspiracy of Enom who a) helped to falsify the domain transfer; b) blocked Plaintiff from access to host records so Hostgator, an Enom reseller, has been able to preserve the registrar status as of December 31, 2013. By blocking Plaintiff, Enom has concealed this information from Plaintiff, all in bad faith for financial gain.

On October 3, 2012 Plaintiff complained to Hostgator that her name servers pointed to *Softlayer.Com* and, in response, Defendant indicated this condition would be corrected within 24 hours but it was not (Exhibit 20).

On December 22, 2012 Plaintiff filed a complaint with the BBB-Better Business Bureau, demanding Defendant remove her content from the aforementioned mask domain. Defendant offered refund in return for her to remove her site but Plaintiff rejected it on the ground that, first, the extent of damage was too great to migrate to another host smoothly. Second, the compensation offered was incomparable to the damage her domain and site were subjected to. As she stated to the BBB, Plaintiff lost her traffic and search engine rankings and, as a result, her revenue. Therefore, instead

of removing her site, Plaintiff requested Defendant take action to bring her site back to where it was before in terms of traffic and Google Page Rank. The extent of the problems she reported to the BBB was what she knew until recently. She absolutely had no knowledge until November 1, 2013 that her domain was hijacked (Exhibit 21).

On September 7, 2013, faced with another sudden drop in traffic, Plaintiff reported to Defendant for help but didn't get it, and then she terminated with Defendant to move her site to In Motion Hosting temporarily (Exhibit 22).

On November 1, 2013 Plaintiff bought a dedicated server from Liquid Web to host her domain but got suspended when she attempted to update her name servers because Who is showed *OnlineTutorForEnglish.Com* still pointed to *50.22.194.100-static-everse.softlayer.com*, even though the last host was In Motion Hosting--before Liquid Web--to whom her domain should have pointed to, showing Hostgator still held her domain (Exhibit 23).

With the aforementioned suspension, the plaintiff discovered Hostgator and Enom never performed the transfer procedure she ordered in September 2012. Liquid Web stated that the suspension was triggered automatically in the Who Is registry as a result of the missing A Record, meaning that the Primary Name Server IP for the DNS *record of OnlineTutorForEnglish.Com* didn't exist. The Start-Of-Authority--SOA showed Hostgator was still the owner as well as an IP address of *WebsiteWelcome.Com* (92.185.64.223) in the Answer Section mapped to Plaintiff (Exhibit 24).

As for the above SOA record pertaining to the IP of Website Welcome, Liquid Web emphatically denied *OnlineTutorForEnglish.Com* didn't point to *WebsiteWelcome.Com* which was utterly a misrepresentation Plaintiff had to confront in the tickets (Exhibit 25).

### 3. 15 US Code, Section.1125 (d) (B) (i) (III) (IV) (V): Defendants have not established evidence of prior lawful use

Defendants have established disingenuous websites for TLD versions of Plaintiff but established no evidence of prior lawful use. Simply establishing a web site, if the actual intent is to sell, will not avoid Defendants a bad faith determination for cyber-squatting. *Name.Com*, a *Demand Media* company who also owns Enom, has offered to sell a misspelled version of her TLD, *OnlneTutorForEnglsh.Com*, without having used, or having an intent to use, in the bona fide offering of goods or services, or a prior pattern of such conduct (Exhibit 26).

Enom has advertised this misspelled version as well (Exhibit 27).

### 4. 15 US Code, Section 1125 (d) (1) (A) (ii) (I): Defendants have trafficked from Plaintiff

Hostgator has diverted Plaintiff's emails to the aforementioned mask domain where the Hostgator bulk email operation of *WebsiteWelcome.Com* is hosted, since January 2011 for over three years. Moreover, this exhibit shows how Plaintiff is being hijacked by Wired Tree mapping her to *SiteGap.Com*; then Hostgator to *WebsiteWelcome.Com*, and Liquid Web to Wired Tree-Site Gap (Exhibit 28).

Defendants forged the MX-Email Exchange protocol, an integral part of the DNS, by redirecting *OnlineTutorForEnglish.Com* to the aforementioned mask or *WebSiteWelcome.Com* and, as a result, Plaintiff has lost email addresses of all her clients to Defendant. The Exhibit shows a letter the plaintiff attempted to send her clients but didn't arrive at their destinations because Defendant altered her clients' email addresses to *@WebsiteWelcome.Com*, in order to mislead the recipient about the origin of the message (Exhibit 29).

**Defendant subjected Plaintiff to pernicious spam:**

In order to maximize revenue, Hostgator has provided all customers the same cPanel-- a graphics interface installed on servers for end-users to manage routine tasks--including login, regardless of the product purchased, whether it's a $15 or $3.74-3.96 plan. With millions of clients accessing the server from this same cPanel, Defendant has monetized this expediency at the expense of Plaintiff. Defendant placed their advertisements on cPanel. Over-sized ad banners and thumbnail hyper-links invited more abuse, putting the plaintiff in more harm ways.

In September 2012, the plaintiff received a complaint notice from a client for a sale Plaintiff never received the initial sale receipt. Defendant refused to disclose the culprit to Plaintiff (Exhibit 30).

In September 2012, in order to protect the site from spam, Plaintiff removed all social media buttons, such as Facebook, Twitter and Linked In, a choice she had to make, leaving only one site banner and text-link menus against a white-color background with lots of free space on the web pages, at the expense of losing social media promotion (Exhibit 31).

In February 2012, the visitors number reached 32,203 (Exhibit 32);

In March 2012, the traffic began falling; it dropped to 28,792 (Exhibit 33);

In April it dropped drastically to 17,094 (Exhibit 34);

In May it 2012 the traffic plummeted over 75 percent to 6,945 (Exhibit 35);

In December 2012 it hit the bottom at 4,677(Exhibit 36).
Left with no support from Defendant, Plaintiff earnestly tried a dedicated server

hosting option for which Defendant provided insufficient information on tech support (Exhibit 37).

In August 2013 Plaintiff reported to Hostgator IP addresses of more mask domains of *static-reverse.softlayer.com* coming into her site but got no attention from Defendant (Exhibit 38).

### 3. 15 US Code, Section 1125 (d) (1) (B) (i) (I): No trademark or intellectual property rights Defendants have to the TLD

Plaintiff has intellectual property rights to the TLD, *OnlineTutorForEnglish.Com*. The mark is the legal name of Plaintiff. She has created and used the site, and produced its content since its inception of September 2006 as of the present. Plaintiff owns the mark: *Online Tutor For English*; and the domain name: *OnlineTutorForEnglish.Com*. To the contrary, this domain name is not the legal name of Defendants. They had no prior use of the domain in connection with the good faith offering of goods and services. Plaintiff is registered with the United States Copy Right Office. All pages appearing on the site currently are copyrighted as referenced in Exhibit 7.

### (III) 15 US Code, Section 1125 (d) (1) (A) (I) (ii) (I): The mark was distinctive at the time of domain registration by Defendants:

Plaintiff transferred her domain to Enom on September 12, 2011 and to Hostgator on February 20, 2012, when Plaintiff was already a distinctive mark in the United States serving a large geographic location. Since September 2006 *Online Tutor For English* has offered American native tutors whose English is their first language and who reside in the United States, along with online English tutorials delivered to clients' email boxes, and English learning resources: conversations lessons, writing lessons, vocabulary enrichment, and articles published at *http://www.onlinetutorforenglish.com*, in a total of 750 pages submitted to Google and the United States Copyright Office.

Plaintiff has built an organic traffic (excluding advertisement) that reached 32,203 monthly visits in February 2012. Within the scope of similar sites offering online English tutoring, this traffic is considered to be solid good, which started bringing income to Plaintiff from advertisement, tutorial purchases, and online tutoring. Google ranked the site on top of first page search results for its resourceful content aimed at adults, college and high school students, for several years.

**(IV) 15 US Code, Section 1125 (d) (1) (B) (i) (VIII): Defendants have advertised identical or confusingly similar versions:**

Defendants created websites identical or confusingly similar to the TLD, *OnlineTutorForEnglish.Com*, that harmed the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site.

What's known to be true to Plaintiff is that Enom has advertised a misspelled version, as in ONLINETUTORSFORENGLSH.COM, under various holders without an accurate address, including by *Name.Com*, an Enom-owned bulk domain retailer, the defendant offered to sell (Exhibit 39).

In addition, Defendants warehoused multiple domain names known to be identical or confusingly similar, diluted the mark to initiate or offer to sell. Sitting on such marks is sufficient evidence of bad faith and an offer to sell is not required. *Name.Com*, a Demand Media company who owns Enom, has offered to sell identical TLD's with extensions such as

ONLINETUTORFORENGLISH.ORG (EXHIBIT 40);

ONLINETUTORFORENGLISH.NET (EXHIBIT 41);

ONLINETUTORFORENGLISH.INFO (EXHIBIT 42);

ONLINETUTORFORENGLISH.BIZ (EXHIBIT 43);

ONLINETUTORFORENGLISH.US (EXHIBIT 44);

ONLINETUTORFORENGLISH.MOBI (EXHIBIT 45);

ONLINETUTORFORENGLISH.CO (EXHIBIT 46);

(1) (A) (i) (ii) (I):  These TLD's and many more identical or confusingly similar versions were displayed on the Enom websites (*http://who.is/; http://name.com*) daily, to benefit from her mark, *OnlineTutorFrEnglish.Com*, that is a distinctive mark at the time of offer to sell such domains and that Plaintiff owns the mark.

**4.  15 US Code, Section 1125 (d); Title 17 US Code, Copyright of the US Code: Defendants infringed Plaintiff's domain and content**

Plaintiff has never purchased or registered the mask: *50.22.194.100-*

*static.reverse.softlayer.com*. On the other hand, Hosgator, who has operated their data center with Softlayer, hijacked her domain. First Defendant mapped Plaintiff to the above IP of their bulk-email operation *(WebsiteWelcome.Com)* and then uploaded her content to it. Defendant is a bulk email vendor; sells *static-reverse.sofylayer.com* masked domains to advertisers that shield themselves from liability for spam.

Plaintiff complained to Defendant that the mask domain never reversed to Plaintiff, *OnlineTutorForEnglish.Com*, making it possible for criminal host(s) to steal the site content, Google page rank and sell them in the black market, as well as divert Google Ad Sense earnings to themselves. Discovering her site and content at different locations, Google has severely demoted her page rank from 4-3 to 2-0, leading Plaintiff to terminate her Ad Sense Publisher account in 2012 she opened in 2010.

## Section 350-e of Article 22-A for Deceptive Advertising

### Defendant failed to provide the product as advertised:

Plaintiff bought the *Business Plan* from Hostgator for features: dedicated IP; unlimited bandwidth, 24/7 technical support, as advertised on the Defendant site.

Defendant has failed to provide these features reasonably well, and, regarding the dedicated IP, provided none. A dedicated IP refers to an IP address mapped only to one single domain and that domain reverses to it, and vice versa, strengthening its integrity in terms of ownership, location and contact information. In other words, a dedicated IP address reinforces protection against unauthorized transfers, which is a severe consequence Plaintiff suffered, lacking it. Defendant, who charged Plaintiff for dedicated IP, didn't provide it. Plaintiff paid Defendant $15 a month for this feature on a shared server, who sold the same product for $3.79-3-96 to millions of others, readily exposing Plaintiff to abuse.

As for the unlimited bandwidth, Plaintiff used minimal resources, about 1.5 - 2 gig byte a month, which is minimal considering 1 tera--1000 gig bytes average usage for small business websites. Her unused bandwidth was given away to other hosts on the same server crowding her space that slowed down her site, otherwise she would have never endured downtime to this extent.

Defendant showed bad faith about the downtime consequences to Plaintiff. While the server was down, Defendant had simply didn't notify Plaintiff. Without an advance notice from Defendant, the site being down several hours and days, cost dearly to Plaintiff. Her site suffered from outdated pages laying around on the server several days, with hacked pages whose information was altered but Defendant provided no backup. To cite severe breakouts, one took place on September 29th through October 4th, 2012 the DNS--Domain Name Server, was inaccessible. Google reported the downtime of the September 29th with the traffic dipped to 148 visitors on this day ((Exhibit 47).

In September 2012, when the downtime was over 17 hours, Defendant never notified Plaintiff (Exhibit 48).

On October 1, 2013, with the site inaccessible several hours without a notice from Defendant, Plaintiff asked for information (Exhibit 49).

Defendant responded very slowly to problems reported through tickets or emails or telephone calls. Defendant sent automatic email replies to tickets and after several hours--usually 24 hours, the tickets got replied.

On phone calls, a recorded message greeted the customer with an announcement that, for improving tech support, the conversation would be recorded and, at the end, there would be a brief survey for the customer to rate the tech support. This practice at a first glance seemed an effective strategy but it turned out to be not so because Plaintiff witnessed the survey recording was turned off at the end of the conversation if no adequate assistance was provided.

Over the phone, Plaintiff observed that tech-support persons couldn't respond to Plaintiff with leeway. If the technician at the work station was unable to deliver an answer for the problem reported, he/she kept keying in Plaintiff's verbatim without answers to questions. Then Plaintiff ended up getting advice from the tech support over the phone to open tickets, therefore, wondering the use of telephone support.


## LIQUID WEB

### Liquid Web mapped Plaintiff to SiteGap.Com:

Since Plaintiff bought the dedicated server plan, Liquid Web consistently claimed she was hosted on it. Nevertheless, Plaintiff has discovered that Defendant has never provided a dedicated server but hosted her on a shared server and in an IP address where other domains were hosted. The Exhibit shows the aforementioned IP pointing to NS.ONLINETUTORFORENGLISH.COM for A Record or Primary IP; and to. 96.30.59.121 to *SiteGap Com* on the Wired Tree server. The DNS lookup showed this configuration in the Authority Section (Exhibit 50).

Site Gap has held Plaintiff's domain with Wired Tree under the hosts of HOST2.SITEGAP.COM (Exhibit 51); and HOST3.SITEGAP.COM in the above IP (Exhibit 52).

On November 1, 2013, as mentioned above, Plaintiff got suspended by Hostgator after she updated the DNS to Liquid Web, due to the missing A Record (the IP of the web host server provider), the Start-of-Authority record showed. Liquid Web had to disclose this information to Plaintiff upon her request later on. To circumvent the suspension gridlock, advised by Liquid Web, Plaintiff replaced her private name servers

with those of Liquid Web temporarily.

**The Domain Name System or DNS Record:**

On November 20, 2013 Plaintiff updated the DNS to resume her private name servers, informing Liquid Web on this update:

NS.ONLINETUTORFORENGLISH.COM;

NS2.ONLINTUTORFORENGLISH.COM (Exhibit 53).

The following are inconsistencies with the Domain Name System or DNS record.

**PTR: The Pointer Record or Secondary IP** (67.225.165.68) must map only to Plaintiff--denoting her domain and, if it's dedicated it reverses to Plaintiff. Liquid Web sold the above IP to Plaintiff as dedicated, meaning that: (a) Plaintiff resolves to this IP; (b) this IP reverses to *OnlineTutorForEnglish.Com*; (c) only Plaintiff is hosted in this IP. Nevertheless, Plaintiff discovered that this IP within the ARPA range is partitioned into several IP blocks on the same shared server on which hundreds of other domains are hosted. Over 900 domains are hosted in the above IP block (Exhibit 54).

**The Start of Authority or SOA Record** specifies authoritative information about a DNS zone, including the primary name server that denotes the domain, the contact email address of the domain administrator, the domain serial number, and several timers relating to refreshing the zone.

On January 4, 2014 after she updated her Private Name Servers so that the SOA would like this:

NS.ONLINETUTORFORENGLISH.COM → 67.225.164.247

NS2.ONLINTUTORFORENGLISH.COM → 67.225.165.68

On April 6, 2014, still, the lookup showed the Site Gap domain, HOST3.SITEGAP.COM, was mapped to NS2.ONLINETUTORFORENGLISH.COM on the Wired Tree server, pointing to the aforementioned IP where Wired Tree hosted the plaintiff (Exhibit 55).

Plaintiff held the above IP from Wired Tree for 6 months who hosted Plaintiff between July 7, 2010 and December 31, 2010 (Exhibit 56).

As to the Primary IP above (first one), Liquid Web claimed Plaintiff is mapped to her dedicated server for A Record. Nevertheless, Plaintiff has discovered that Defendant never hosted Plaintiff but operated their own DNS server, *DNSSource.Com*, on this server. The exhibit shows *DNSSource.Com* within the network IP range serving several domains for DNS request on this server (Exhibit 57).

Defendant created the DNS zone for *host.onlinetutorforenglish.com*, a second level domain, mapping it to the above IP, instead of *onlinetutorforenglish.com* to it for A Record, on this server. The DNS lookup showed this server is used for only DNS requests but no domain is hosted on it. Apart from that, the Web Host Management or WHM panel revealed the hosting plan for Plaintiff as *Pro* the defendant listed on their website for $15 a month whereas Plaintiff paid $179 (Exhibit 58).

**NS: The Name Server Record** specifies name servers for the domain, which allows DNS lookups within various zones of a domain by using IP address. Two types of name servers pointing to two IP addresses must be declared through this record: Primary Name Server or A Record; and Secondary Name Server or PTR. For example: NS.ONLINETUTORFORENGLISH.COM is mapped to 67.225.164.247; and NS2.ONLINTUTORFORENGLISH.COM to 67.225.165.68. The NS and NS2 abbreviations for Plaintiff's name servers are declared in a manner to clearly identify that these two types of name servers exist in the DNS record. The Primary IP identifies the server of the web host on which the domain is hosted; and the Secondary IP the domain location on the server: see Page 6 - 7. If the Secondary IP is dedicated it reverses to the domain--Plaintiff, strengthening domain protection against abuse in the DNS record, along with Private Name Servers denoting the domain name as referenced above. Regarding these name servers, Plaintiff has discovered inconsistencies in her DNS.

On September 8, 2010 Plaintiff updated her private name servers to Wired Tree (Exhibit 59).

On January 1, 2011 Plaintiff migrated to Hostgator from Wired Tree but no IP addresses for the name servers of Hostgator for A and B record appeared in the DNS lookup, in other words, Wired Tree – Site Gap were still holding her domain (Exhibit 60).

For the PTR or Secondary IP, Plaintiff pointed to *static-reverse.soflayer.com*. Lookup also showed Plaintiff pointed to *WebsiteWelcome.Com* at *http://50.22.194.100-static-reverse.softlayer.com*, masking the host (*SiteGap.Com*) on the *Hostgator-WebsiteWelcome.Com* server (Exhibit 61).

On September 9, 2012 the Hostgator CEO, Adam Farrar, appeared for administrative and technical contact in Who Is, at the time when Plaintiff complained to the BBB over the fraudulent transfer Hostgator and Enom were involved in--see Page 7 (Exhibit 62).

The DNS inquiry showed on December 31, 2013 Hostgator still held Plaintiff. Her Enom registrar record has this information and, with a subpoena, Plaintiff will access to the host records (Exhibit 63).

On January 4, 2014 Plaintiff attempted to correct the Enom record: removed the Hostgator DNS; disclosed her name, contact and email address, and telephone number (Exhibit 64).

On January 5, 2014 Plaintiff still pointed to Site Gap-Wired Tree. Hostgator held her domain; Liquid Web pointed her to all these Defendants using her Email Exchange--PTR or Secondary IP (Exhibit 65).

On April 6, 2014 Plaintiff pointed to Liquid Web for A Record and Site Gap-Wired Tree for PTR (Exhibit 66).

The Who Is inquiry unearthed the fact that since July 7, 2010, after the date Plaintiff migrated to Wired Tree, all Defendants conspired in unauthorized transfers and Site Gap emerged as one culprit, hiding himself behind the defendants' servers. Currently an undisclosed registrant with Domains By Proxy, Paul Osborne appeared as the owner of *SiteGap.Com* who didn't provide his address to Plaintiff (Exhibit 67).

Plaintiff also contacted Domains By Proxy for the address and location of Site Gap, who demanded a subpoena with $75 service charge for disclosure. Plaintiff requests the Court subpoena this registrar (Exhibit 68).

**Liquid Web devised additional name servers: (1) (A) (I) (ii) (B) (i) (VI):**

Liquid Web has devised additional name servers in order to conveniently orchestrate a maze of IP mapping. The defendant pointed Plaintiff to their shared server to leave out her private name servers to the defendants, facilitating the mapping of the defendants to transfer her domain, as outlined below.

NS.LIQUIDWEB.COM: 69.16.222.254
NS1.LIQUIDWEB.COM: 69.16.223.25

With the above name servers, Liquid Web acquired a fraudulent Start of Authority or SOA, which served the purpose, in order to accommodate Defendants to sustain NS2.ONLINETUTORFORENGLISH.COM (her private name server), mapped to them, as well as helped to transfer Plaintiff out easily, and, in the meantime, host her on the shared server (Exhibit 69).

**Unauthorized Registrants:**

On March 2, 2014, Plaintiff discovered the aforementioned Secondary IP is mapped to HOST2.STGEORGEACADEMY.NET, as well as to others. Lookup showed additional domains pointed to it. First, Enom registered, the above host must have transferred Plaintiff in to themselves and, then Liquid Web must have mapped Plaintiff to this host (Exhibit 70).

On March 4, 2014 Plaintiff demanded Liquid Web explain this condition, who didn't provide an accurate answer. Technicians contradicted one another in their reply, notwithstanding that the plaintiff had a dedicated IP and dedicated server but was hosted on the shared server (Exhibit 71).

March 24, 2014 several DNS lookups showed the aforementioned PTR or Secondary IP mapped to other domains. On the Liquid Web shared server, within the range of this IP several other domains of about 905 are hosted and *OnlineTutorForEnglish.Com* is numbered 583 in the list. The Exhibit illustrates the first page, page Plaintiff appears on, and the last page (Exhibit 72).

## MX-Mail Exchange Record:

This is a type of resource record in the Domain Name System that specifies a mail server responsible for accepting email messages on behalf of a recipient's domain, and a preference value used to prioritize mail delivery if multiple mail servers are available. The set of MX records of a domain name specifies how email should be routed with the Simple Mail Transfer Protocol (SMTP). When an e-mail message is sent through the Internet, the sending Mail Transfer Agent (MTA) queries the Domain Name System for MX records of each recipient's domain name. This query returns a list of host names of mail exchange servers accepting incoming mail for that domain and their preferences. The sending agent then attempts to establish a Simple Mail Transfer Protocol or SMTP connection.

Defendants specified multiple mail servers for the MX record of Plaintiff; routed mail to each recipient domain in the priority order. For this intent, Defendants first created additional name servers and then an authoritative MX server.

On March 18, 2014, faced with the control of her email by Defendants and denied access by Enom to change her password in order to block out Defendants, Plaintiff removed her contact email address from Liquid Web to Hotmail, and updated the Enom record for this change (Exhibit 73).

On March 24, 2014, the SOA showed a new record with a serial number (Serial No: 2014031901) for the last update of March 19, 2014. Nevertheless, still the contact email pointed to *contact@onlinetutorforenglish.com*, which Defendants redirected to themselves, substantiating Defendants have continued to alter the MX SOA or Mail Exchange Start of Authority (Exhibit 74).

Enom, on their website (http://who.is/), pointed to the above SOA, still showing *contact@onlinetutorforenglish.com,* for the contact email instead of *susangusa@hotmail.com* (Exhibit 75).

On January 15, 2014, due to the manipulated MX, Plaintiff suffered inundated spam, compromising her domain and content further. She relentlessly complained to Liquid Web but to no avail. After some 50 pages of email exchange in the hands of several technicians unfamiliar with the matter, Liquid Web offered no solution and therefore Plaintiff had to remove her blog she created on the Defendant server (Exhibit 76).

Given that, with a delivery priority order for each recipient domain, the Mail Transfer Protocol or MTR transfers the mail first to the highest priority recipient (Liquid Web, Wired Tree, Site Gap), Plaintiff has never received client mails to her *contact@onlinetutorforenglish.com box.*

Nevertheless, on March 13, 2014 the dig query (a command level query string) returned the Start of Authority or SOA as still pointed to Liquid Web to their aforementioned name servers (Exhibit 77).

On December 20, 2013 Plaintiff reported to Liquid Web that the script was again altered on cPanel or the end-user interface. Defendant indicated that it may be related to Hostgator and later reported they'd installed a new cPanel, however, no notification of cPanel was published on her domain, because it takes 24 hours to make the migration simply meaning that Defendant kept the same cPanel belonging to Hostgator (Exhibit 78).

On January 3-19, 2014 Plaintiff reported a trojan virus infection in her emails and an email she sent to Liquid Web but was never delivered to them—the defendant claimed when she called up the defendant. Although she requested urgent action, the infected folder laid around several weeks into February 2014, and therefore Plaintiff had no option but remove the infected mails altogether under the poor tech support Defendant has offered online (Exhibit 79).

Online technician from different locations replied to tickets immediately but nevertheless mostly ineffectively due to both rapidly changing short shifts they took on so they were unfamiliar with the ticket matter, also they lacked adequate expertise. Under this condition, the mail infection got convoluted through email tag trailing to several reply tabs over 15 pages but without a resolution (Exhibit 80).

On April 2, 2014 cPanel was replaced, meaning that the host has changed so Plaintiff is not hosted on the Liquid Web server. This was an unauthorized transfer again but Liquid Web never disclosed it to Plaintiff (Exhibit 81).

On April 8, 2014 Home, *http://onlinetutorforenglish.com/index.php*, didn't propagate to Liquid Web. Plaintiff required Liquid Web explained the situation and correct it. Nevertheless, Liquid Web attempted to intercept into Plaintiff's password to access her Web Host Management (WHM) panel which is exclusively reserved to the customer and protected with password against abuse. In addition, the WHM showed no IP address exists on the defendant's server, meaning that Plaintiff is pointed to another host outside Liquid Web. The home page showed a different location address in the error message for the location of *http://onlinetutorforenglish.com/index.php*. The Home page has been down since April 9th, 2014. Currently, the site has been down altogether since May 2nd, 2014. Plaintiff reported the problems but Defendant took no action (Exhibit 82).

**Plaintiff charges Liquid Web with:**

1. **Deceptive Advertising, pursuant to Section 350-e of Article 22-A**
2. **Infringing her domain, pursuant to 15 US Code, Section 1125 (d)**

**Based on the above, under Section 350-e of Article 22-A Plaintiff charges Liquid Web with deceptive advertising and fraud.** The plaintiff brings this action to recover her actual damages from the defendant's unlawful act and practices enumerated in the provisions of Section 350-e.

Any person who has been injured by reason of any violation of section three hundred fifty or three hundred fifty-e of this article may bring an action in his or her own name to enjoin such unlawful act or practice. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages, up to ten thousand dollars, if the court finds that the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

The plaintiff is injured by reason of violation of Section 350-e of Article 22-A, because the defendant willfully and knowingly violated the provision. The defendant misrepresented the features: dedicated server, dedicated IP address, 99 percent uptime, and 24/7 hours "Heroic Support". Defendant didn't provide a dedicated physical server with 16 GB or Giga byte, and 99 percent uptime. The IP address is not dedicated because the defendant has included other domains in it. Defendant didn't deliver 99 percent uptime, unlimited space, and 24/7 technical support. The misleading of the defendant's ads is material and actionable because the plaintiff suffers losses.

The plaintiff has used minimal server resources from Defendant, only 1-1.5 gig byte a monthly bandwidth, meaning that considerably light resources the defendant has allocated to the plaintiff. And, despite that, her website has fallen into the hands of hackers. Inundated email spam have become common place attesting, on the part of the defendant, to a significant degree of failure of not providing the services advertised.

**Liquid Web infringed her domain in violation of 15 US Code, Section 1125 (d) (1) (A) (B) for monetary gain.**

**On May 2, 2013 Plaintiff reported to Defendant that the site was down due to the inaccessible DNS servers, but Defendant refused support unless she gave away her password or she was "unmanaged" currently (Exhibit 83).**

Never changed her aforementioned plan she purchased on November 1, 2013, Plaintiff pleaded with Defendant to get her site recovered. Following up with the DNS record on the WHM, she emailed Defendant the WHM-DNS zone report for them to update and then email it back to her if necessary. Defendant kept replying with refusal for help, letting Plaintiff down as of the filing date of this complaint.

The Web Host Management board or WHM shows the shared server pl(the user-end graphics interface) (the user-end graphics interface)an the defendant hosted Plaintiff, which is *Pro,* advertised for $15 a month instead of $181 the defendant charged the plaintiff (Exhibit 84).

Defendant has configured the WHM under the same IP address assigned to Plaintiff but gave *root access* to other users on the *Pro* plan on the same server since November 1, 2013 after she migrated to Defendant, where she's been subjected to inundated spam. Plaintiff created several tickets on spam incidents but ended up with no results (Exhibit 85).

Defendant has operated an email-ticket-support system online, calling it *heroic support.* Outsourced with technicians from different locations who were on short shifts, neither had adequate time nor expertise. They replied the tickets immediately, nevertheless, with prolonged never ending email tag without results, the tech support was no heroic but poor and ineffective (Exhibit 86).

As for the abuses the Web Host Management board or WHM, Plaintiff created tickets through which she disclosed her WHM password when asked by Liquid Web technicians where she exposed to brute force or high-risk attacks, which repeatedly infected her email.

On April 8, 2014 a virus, named *Heart Bleed,* was announced publicly to the nation for possible high-threat attacks against large computer networks. On April 9, Plaintiff received an announcement from Defendant regarding this virus that her server was rescheduled for reboot for protection against *Heart Bleed.* Nevertheless, immediately after her server was rebooted, her home page *(http://onlinetutorforenglish.com/index.php)* was unavailable to visitors. The home page requests returned a text string: *permit for access denied,* returning "Not Found" errors because the home page URL or address was located on a different server other than Liquid Web, implicating the site is pointing to another server, the site is transferred to others. With the home page returning *Not Found* errors, Defendant has severely damaged Plaintiff further more. Search engines immediately unindexed the home page. Without a home page greeting visitors, no website can have a legitimate stand on the Internet. As of the filing of this complaint, Defendant neither disclosed the culprits nor offered a solution to correct the problem, except Defendant wanted access to the WHM password where they could further alter the settings, such as the shared server plan and DNS settings indicating Plaintiff has no A Record or PTR on the defendant server.

On April 26, 2014 the server was down over 2 hours between 4 PM and 6:30 PM during the busy traffic but Defendant didn't provide any disclosure. In the meantime,

Defendant posted announcements on sever downtime for scheduled maintenance for several times, but no disclosure in the aftermath (Exhibit 87).

## WIRED TREE

Plaintiff claims Wired Tree has infringed her trademark and service mark in violation of the Act 15 U.S.C Section 1125(a) and (d). Plaintiff purchased a Virtual Private Server (VPS) from Wired Tree on July 6, 2010 to host her TLD, *OnlineTutorForEnglish.Com*, for $49.50 a monthly fee (Exhibit 88).

On September 9, 2010 Plaintiff renewed domain registration, pointing her domain to Wired Tree. She purchased a dedicated IP and registered the Private Name Servers with Tucows. Her private name servers pointed to the Wired Tree IP addresses:

NS1.ONLINETUTOROFORENGLISH.COM: 96.30.59.121
NS2.ONLINETUTORFORENGLISH.COM: 96.30.59.120 (Exhibit 89).

Defendant provided Plaintiff with the dedicated IP 96.30.59.121, which Plaintiff discovered recently, also mapped it to *SiteGap.Com* (Exhibit 90).

The virtual private server (VPS) is a virtual machine with far fewer domains hosted on the server. For many purposes it is functionally equivalent to physical server, and being software defined, able to be much more easily created and configured. Nevertheless, despite a relatively easy setup process, Defendant at the very beginning failed to adequately set up the service. After months into the service, not configured the server properly, Defendant exhibited an unacceptable level of negligence. Plaintiff used minimal space out of her allocated bandwidth, nonetheless to her disadvantage, because she soon discovered other hosts took up her unused bandwidth slowing down her site, and she complained to Wired Tree (Exhibit 91).

On January 1, 2011, under the circumstances, Plaintiff terminated with Wired Tree to migrate to Hostgator (Exhibit 92).

## DAMAGES

Plaintiff has lost its actual and future revenues:

The site took off in early 2012 when Plaintiff began to earn income from advertisement, tutorial purchases and online tutoring, but then again, in the same year all sales dropped, and she's lost all potential revenues since then. Plaintiff has suffered the loss of traffic, search engine rankings, and advertisement value.

**Lost Traffic:**

Plaintiff has built an organic traffic that averaged 25,000 monthly visits in 2011. Organic traffic is based on visitors that come to the site from search engines on keyword search--words, phrases entered in the search box. Nevertheless, since May 2012 the traffic has drastically plummeted to one-third of it. Currently, the site has been down due to the DNS transfers, bringing the site to a complete halt.

## The Domain and its Content Infringed:    Comn

Google has unindexed duplicated or redirected pages, severely demoted the page rank of about 400 pages. The Page Rank is a Google metric that assigns a value to the site and to a webpage in terms of the importance of the page to the user. And, as a result, the website is buried away from Google search results.

A federal jury in California found Akanoc Solutions, Managed Solutions Group and Steven Chen liable for contributory trademark and copyright infringement, awarding Louis Vuitton Malletier SA $32.4 million in damages.

The court ruled that the defendants knew or should have known that its customers were using its services to infringe or to facilitate others to directly infringe Louis Vuitton's trademarks. They had reasonable means to withdraw their services from counterfeiters, but they continued to provide services to the customers. Louis Vuitton filed the lawsuit in 2007, after finding a group of sites with the same Internet address selling what it believed was counterfeit Louis Vuitton merchandise. The sites were hosted by Fremont, California-based Akanoc Solutions Inc. and Managed Solutions Group Inc., both operated by Steven Chen.

The case of Plaintiff is similar to the Louis Vuitton against Akanoc Solutions and Managed Solutions. The defendants have infringed her mark and copyrighted content, and allowed infringing of the culprits all in bad faith intent for financial gain, and defrauded her willfully.

**Lost Advertisement Value:**

All the above, the infringed domain and content of Plaintiff, have led to the loss of traffic, search engine rankings, and as a result, Plaintiff has incurred financial damages: actual loss of revenue, future losses of advertisement and tutoring and tutorial subscription.

Plaintiff holds the defendants responsible for prolonged service interruptions that took several hours on a given day and several days in the case of Liquid Web.

A Baltimore judge granted the final approval of $1.67 million class action lawsuit settlement between a web hosting company and almost 6000 clients who joined the lawsuit as a result of prolonged service interruptions after a failed server migration. The plaintiffs consist of business and personal Web site owners as well as larger resellers of

server space from all over the world. As a result of the lawsuit they will receive four times their monthly bills from Andover, Mass.-based Navi Site Inc. Attorney fees will be calculated. http://doihavealawsuit.com/lawyer-attorney/class-action-lawsuit/165-class-action-lawsuit-settlement.html.

**The defendant has failed to provide the services advertised:**

In the events of downtime, Defendants flatly denied them despite evidence or never disclosed them.

**Defendants have failed to provide adequate uptime:**

Plaintiff holds the defendants responsible for prolonged service interruptions that took several hours on a given day, and several days in the case of Liquid Web.

**The defendants have failed to provide dedicated IP address:**

Without a dedicated IP, the backbone of a website domain, the plaintiff's site has fallen off into the hands of hackers. The defendants knowingly, in bad faith, infringed her domain and copyrighted content, and inflicted inundated spam gradually bringing her domain down.  Defendants acted maliciously all in bad faith to deceit, defraud the plaintiff. On the other hand, Plaintiff has paid them incomparably hefty fees for what they promised and didn't deliver, but instead inflicted irreversible damages on her business she has invested her eight years, money and hard work.

## REMEDIES

Plaintiff seeks an injunctive relief under 15 U.S.C., Section 1125 (d) (1), including, but not limited to, an award for statutory damages under 15 U.S.C. Section 1117 (d), as the court finds just for the violations of the Section 43, Section 1125 (d) (1). For the TLD domain, *OnlineTutorForEnglish.Com*, and for the identical or confusingly similar versions, not less than $75,000 but not more than $100,000, as the court considers just. Under the 15 U.S. Code Section 1125 (d)(1) of the ACPA, Defendants have had "traffics" referring sales and/or transfer of Plaintiff's TLD domain *OnlineTutorForEnglish.Com*, to transactions that include, but are not limited to, sales and purchases, pledges, licenses, exchanges of currently, and any other transfer for consideration.

Actions Plaintiff requests but not limited to are:

1) Transfer the TLD domain, *OnlineTutorForEnglish.Com*, to Plaintiff

2) Cancel or transfer all TLD versions, to Plaintiff:

> *OnlineTutorsForEnglish.Com*

> ONLINETUTORFORENGLISH.ORG;

> ONLINETUTORFORENGLISH.NET;

ONLINETUTORFORENGLISH.ORG;

ONLINETUTORFORENGLISH.BIZ;

ONLINETUTORFORENGLISH.INFO

3) Cancel misspelled versions of *OnlineTutorForEnglish.Com* as in

ONLINETUTORFORENGLSH.COM

4) Cancel or transfer identical or confusingly similar versions to Plaintiff, as in:

ONLINETUTORSFORENGLISH.COM;

THEONLINETUTORSFORENGLISH.COM;

5) Forbid Defendants to resell or transfer the TLD *OnlineTutorForEnglish.Com* and all aforementioned identical or confusingly similar versions;

6) Forbid Defendants to infringe or import the intellectual property of Plaintiff;

7) Forbid Defendants to import or upload Plaintiff's content to other web sites;

8) Forbid Defendants to dilute Plaintiff's ownership of the registered TLD domain, *OnlineTutorForEnglish.Com*, on and through publicly known registry boards;

9) Forbid Defendants to divert traffic from the TLD, *OnlineTutorForEnglish.Com*

10) Forbid Defendants to block access to host records in registrar panels and all related registries;

11) Forbid Defendants to block access to all records related to the TLD.COM, on the both Defendants' servers and in databases;

12) Award for statutory damages for the TLD domain name: *OnlineTutorForEnglish.Com*, and for all versions given above.

13) Order Enom unblock access to Plaintiff to all panels, including: Host Records; Contact Information, Password Edit, Account Information.

14) Order Enom stop unauthorized access to Plaintiff's password and transfer.

## VENUE JURISDICTION

Upon information and belief, this court has personal jurisdiction over all Defendants: Enom, Hostgator, Wired Tree and Liquid Web. All Defendants have

business in New York, being resellers for Enom, a subsidiary of Demand Media located in New York, New York. Under the New York long arm CPLR Section 302 CPLR 302 (a) (1) personal jurisdiction, as a result of contacts, including transacting business in the state, contracting to supply and sell goods in the state, deriving substantial revenue from goods used or consumed in the state. Defendants are regularly doing and soliciting business in the state and are deriving substantial revenue from goods used or consumed in the state. Defendants have significant business with Google who also has headquarters in New York, New York. They all advertise with Google Ad Words. With the parent company, Demand Media whose headquarters based in New York, New York, Enom is a multi-million dollar enterprise and You Tube partner of Google (Exhibit 93).

So is Hostgator, who has substantial business with Google both as Google Ad Words reseller and advertiser (Exhibit 94).

Liquid Web advertises with Google, sufficiently establishing the requirement for substantial revenue from goods used and consumed in the State of New York (Exhibit 95).

Wired Tree is also engaged in business activity through coupons and advertising with Google Ad Words in New York, New York (Exhibit 96).

In pursuant to CPLR Section 302 CPLR 302 (a) (1), Defendants have engaged in significant amount of connection through business activity that constitutes substantial contact in the New York State in which Plaintiff has filed the lawsuit and the case involves that activity. Therefore, it's fair for the New York State to exercise power over Defendants.

*Susan Grey*