UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
SUSEN GENCH,                                            :

              Plaintiff,                       :    REPORT AND
                                                    RECOMMENDATION
  -v.-                                                  :
                                                    14 Civ. 3592 (RA) (GWG)
HOSTGATOR.COM LLC, et al.,                              :

              Defendants.                      :
---------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

Plaintiff Susen Gench filed suit against defendants HostGator.com LLC ("HostGator"); Wired Tree; eNom Incorporated ("eNom"); Liquid Web Incorporated ("Liquid Web"); and an entity referred to as "SiteGap.com; SiteGap.Net; Site Gap" ("Site Gap"), alleging violations of federal trademark and copyright law and New York's law against false advertising. HostGator, Wired Tree, and eNom (collectively, "defendants") have each moved to dismiss the complaint. For the reasons that follow, these motions should be granted.

I.    BACKGROUND

    A.    Facts Alleged in the Amended Complaint

For the purposes of deciding the defendants' motions to dismiss, the Court assumes that the factual allegations in Gench's amended complaint are true and draws all reasonable inferences in her favor. See, e.g., Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014) (citation omitted). That being said, we note that the allegations in Gench's 25-page largely single-spaced amended complaint are extremely difficult to follow. Nonetheless, we summarize below the facts that are material to her claims as best we can understand them.

1

On September 12, 2007, Gench registered the domain name OnlineTutorForEnglish.com (the "domain") with an entity called "Tucows." See Amended Complaint, filed May 23, 2014 (Docket # 5) ("Am. Compl."), at 4.  But see Ex. 2 to Am. Compl. (reflecting a registration date of September 12, 2006).  Since then, Gench has operated the OnlineTutorForEnglish.com website (the "site").  See Am. Compl. at 4-5, 10.  The site provides tutoring by native English speakers and other English-language learning resources.  See id. at 10.  The site offers its users the opportunity to live chat with tutors through the use of a console installed on Gench's computer.  See id. at 5.  Gench has advertised the site in various media, including via Google AdWords, Yahoo!, and LinkedIn.  See id. at 4.  Gench has also produced other content bearing the name "Online Tutor For English," including videos published on YouTube and articles published on the site and on other websites.  See id. at 4-5.  Gench makes income from the site from advertisements, tutorial purchases, and online tutoring purchases.  Id. at 10.

On July 6 or 7, 2010, Gench enlisted Wired Tree to host her website.  See id. at 14-15, 21.  Although the site used a "minimal" amount of its "allocated bandwidth," it still ran slowly, to Gench's dissatisfaction.  See id. at 21.  In January 2011, Gench transferred the site from Wired Tree to HostGator, having purchased a web hosting "Business Plan" from HostGator.  See id. at 5-6, 21.  This plan included a dedicated IP address, unlimited bandwidth, and 24/7 technical support, and cost Gench $15 per month.  See id. at 5, 12.  The site used only "minimal resources," about 1.5 to 2 gigabytes of bandwidth per month.  Id. at 12.

In September 2011, Gench transferred her domain to eNom, but in either February or March 2012, she transferred it back to HostGator.[1]  See id. at 5, 10.  At some point thereafter,

---

[1] It is unclear from the amended complaint exactly what services Gench received from HostGator and eNom.  Her statements about the transfers between HostGator and eNom suggest that she may be claiming that the site was hosted by both entities at various points.  See, e.g.,

2

Gench became dissatisfied with HostGator's service, as the site was experiencing significant downtime and she felt HostGator was not responding quickly or effectively to her complaints. See id. at 5, 12-13. Eventually, Gench requested that the domain be transferred back to eNom, though this transfer was never completed, or was completed and subsequently reversed. See id. at 5 (alleging that HostGator either "never completed the transfer" or completed it then "transferred it back to themselves"); id. at 8 (alleging that "HostGator and Enom never performed the transfer procedure"). On September 7, 2013, Gench temporarily transferred the domain to a company called In Motion Hosting, which is not named as a defendant in this suit. See id. at 8. Then, on November 1, 2013, Gench once again transferred the domain to defendant Liquid Web. See id.

The number of visitors to the site reached a high of 32,203 in February 2012, see id. at 9-10; Ex. 32 to Am. Compl., but then declined substantially, see Am. Compl. at 8-9; Exs. 32-36 to Am. Compl. With this loss of traffic, the site also suffered losses in advertisement value, search engine rankings, and overall profitability. See Am. Compl. at 21-22. The site has not operated since May 2, 2014. See id. at 18, 22.

B.  Procedural History

Gench filed the original complaint in this action on May 19, 2014. See Complaint, filed May 19, 2014 (Docket # 2). On May 23, 2014, Gench filed an amended complaint, which

---

Am. Compl. at 5 ("[I]n the face of failing services of Hostgator, Plaintiff ordered to transfer back to Enom but Defendants dragged it; never completed the transfer . . . ."); id. ("Plaintiff transferred to Hostgator, an Enom reseller, and paid Defendant for domain registration . . . ."). eNom characterizes itself as a "domain name registrar" rather than a web hosting service. See Memorandum of Law in Support of eNom Inc.'s Motion to Dismiss, filed Aug. 14, 2014 (Docket # 64), at 2. It is not necessary to determine whether Gench's allegations are intended to characterize eNom as a web hosting service rather than a domain name registrar as her allegations do not state a claim in either event.

alleges violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); the Copyright Act, 17 U.S.C. §§ 101 et seq.; and New York's law against false advertising, N.Y. Gen. Bus. L. §§ 350 et seq. (McKinney 2014). See Am. Compl. at 3. Annexed to the amended complaint are more than 90 exhibits, comprising nearly 400 pages.

At the same time she filed her original complaint, Gench requested a preliminary injunction and temporary restraining order to require the defendants to provide her access to OnlineTutorForEnglish.com and to require them to provide her with certain information about the website. See unsigned Order to Show Cause for Preliminary Injunction and Temporary Restraining Order, filed May 19, 2014 (Docket # 3); see also Letter addressed to Judge Lewis A. Kaplan from Susen Gench, filed May 23, 2014 (Docket # 4). By Order dated May 29, 2014 (Docket # 6), Judge Ronnie Abrams denied this request.

On June 25, 2014, HostGator filed a motion to dismiss the claims against it (Docket # 14), with an accompanying memorandum of law (Docket # 15).[2] Gench then submitted to the Court — and apparently served on HostGator's counsel — a document dated July 9, 2014, entitled "Motion in Opposition to Dismiss." See Order dated July 14, 2014 (Docket # 45), at 2; Endorsed Letter addressed to Magistrate Judge Gabriel W. Gorenstein from Tom Monagan, filed Sept. 9, 2014 (Docket # 74) ("Sept. 9 End.."), at 1. The Clerk's office rejected this document for

---

[2] On the same date HostGator filed its motion to dismiss, a Clerk's certificate of default was filed against HostGator (Docket # 12). This does not affect our consideration of HostGator's motion to dismiss inasmuch as no default judgment could be entered against HostGator based on a complaint that fails to state a claim. See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 n.23 (2d Cir. 2011) ("a district court may not enter a default judgment unless the plaintiff's complaint states a valid facial claim for relief") (citing cases). Accordingly, we address HostGator's motion to dismiss on the merits notwithstanding the certificate of default.

filing because at the time of its submission to the Pro Se Office, Gench was required to file through the ECF system, as she had previously requested, and the document had been submitted in paper form.  See Motion for Permission for Electronic Case Filing, filed June 23, 2014 (Docket # 11).  Ultimately, this document was filed with the Court because it was attached to a different document Gench filed on August 22, 2014, which she styled as a motion for "summary judgment" against HostGator.  See Plaintiff's Motion for Summary Judgment Pursuant to Rule 56(f)(1) Against HostGator for Failure to Properly Address Facts (e), to Dismiss Motion 12(b)(6) Pursuant to Rule 12(b)(7) and Rule 19 for Failure to Join a Party, SiteGap.com; Sanctions Pursuant to 11(b) Frivilous [sic] Defense for Unauthorized Domain Registration, Copyrighted Content Infringement: Static.reverse.softlayer.com; and for Deceptive Advertising of Bandwidth Under 350-e, and for Failure to Timely Serve the Motion, filed Aug. 22, 2014 (Docket # 66) ("Pl. Opp'n to HostGator").[3]  Even though the July 9 document had not been filed on the docket sheet, HostGator filed a reply memorandum in response to it on July 30, 2014. See Reply in Support of HostGator.com's Motion to Dismiss Pursuant to Rule 12(b)(6), filed July 30, 2014 (Docket # 54).  After Gench filed the "summary judgment" document, the Court directed HostGator to treat it as further opposition to HostGator's motion to dismiss.  See Sept. 9 End. at 2.  HostGator filed a second reply brief on September 30, 2014.  See Additional Reply Brief in Support of HostGator.com's Motion to Dismiss Pursuant to Rule 12(b)(6), filed Sept. 30, 2014 (Docket # 84).

On July 1, 2014, Wired Tree filed its motion to dismiss (Docket ## 22, 23).  On July 10, 2014, it filed a memorandum of law in support of that motion (Docket # 30), which relied largely

---

[3] All citations herein to Docket # 66 are to the August 22, 2014 "summary judgment" document, not to the July 9, 2014 document.

5

on HostGator's memorandum of law, see id. at 1.  Gench opposed this motion to dismiss in a document filed on August 8, 2014.  See Plaintiff's Reply in Opposition to Wired Tree's Motion of Rule 12(b)(6) to Dismiss, Pursuant to Rule 12(b)(7) and Rule 19 for Failure to Join a Party, SiteGap.com, Frivolous Defense, Sanctions: Rule 11(b), filed Aug. 8, 2014 (Docket # 58) ("Pl. Opp'n to Wired Tree").  Wired Tree filed a reply in further support of its motion to dismiss on August 29, 2014.  See Defendant Wired Tree's Reply Memorandum of Law in Further Support of Its Motion to Dismiss Pursuant to Rule 12(b)(6), filed Aug. 29, 2014 (Docket # 71).

On August 14, 2014, eNom filed a motion to dismiss (Docket # 63) and accompanying memorandum of law (Docket # 64).  Gench opposed this motion in a document filed on September 12, 2014.  See Plaintiff's Motion in Opposition to Defendant eNom's Rule 12(b)(6) Motion to Dismiss Complaint, Pursuant to Rule 56(f)(1) and Rule 19, for Failure to Properly Address Facts to Include Site Gap: Frivilous [sic] Defense for Failure to Take Action to Stop Unauthorized Transfers, Bad Faith Intent Under the Lanham [sic] 43(a); 15 U.S.C. Section 1125(d): For Blocking Plaintiff's Access to Host Records and Password Protection; Violation of ICANN Registrar Responsibilities: Contractual Agreement Section 3; Contributory and Vicarious Liability, with Defendants, HostGator, Liquid Web, and Site Gap, filed Sept. 12, 2014 (Docket # 77) ("Pl. Opp'n to eNom").  eNom filed a reply to this opposition on October 3, 2014.  See Reply Memorandum of Law in Support of eNom Inc.'s Motion to Dismiss, filed Oct. 3, 2014 (Docket # 85).

II.     LEGAL STANDARD FOR MOTION TO DISMISS

A party may move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) where the opposing party's pleading "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  While a court must accept as true all of the allegations contained in a

complaint, that principle does not apply to legal conclusions. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citation, internal quotation marks, and alteration omitted). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Iqbal, 556 U.S. at 678, and thus a court's first task is to disregard any conclusory statements in a complaint, see id. at 679.

 Next, a court must determine if a complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 678 (citation and internal quotation marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion.") (citation omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citations and internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" — but not "'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

 In the case of pro se plaintiffs, "[a] document filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than

formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (citations and internal quotation marks omitted); accord McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be construed liberally and interpreted "'to raise the strongest arguments that they suggest'") (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). However, even pro se pleadings must contain factual allegations that "'raise a right to relief above the speculative level.'" Dawkins v. Gonyea, 646 F. Supp. 2d 594, 603 (S.D.N.Y. 2009) (quoting Twombly, 550 U.S. at 555).

III. DISCUSSION

Much of the amended complaint consists of allegations against Liquid Web, see Am. Compl. at 13-21, which is not one of the defendants whose motion is the subject of this Report and Recommendation. As to the three defendants whose motions to dismiss are considered herein, we construe the amended complaint to raise claims of trademark infringement, trademark dilution, false designation of origin and false description, cybersquatting, and copyright violations. Additionally, we construe it to raise a state law claim of false advertising against HostGator. This accords with Judge Abrams's reading of the amended complaint in her decision denying Gench's motion for a temporary restraining order. See Order, dated May 29, 2014 (Docket # 6), at 3, 5.

    A.    Trademark-Related Claims

Gench's trademark-related claims appear to be based on the assertion that HostGator, with the help of eNom, transferred her site or "domain" to itself (or its CEO Adam Farrar), that it somehow falsified the record of this transfer, and that it attempted to conceal these facts from Gench. See, e.g., Am. Compl. at 5 (HostGator and eNom "never completed the [requested] transfer . . . . Instead, Hostgator transferred it back to themselves (Adam Farrar), [and] falsified

8

the administrative and technical contact"); id. at 7 ("[B]y depriving Plaintiff of a dedicated IP and then by falsifying the Domain Name System (DNS) record, Hostgator hijacked her domain . . . replacing Plaintiff's name and address with the Hostgator CEO, Adam Farrar."); id. (HostGator uploaded the site's content to a "mask domain whose hosts are shielded" with the "conspiracy of Enom who a) helped to falsify the transfer; b) blocked Plaintiff from access to host records" to "conceal[] this information from Plaintiff"); id. at 12 ("Hostgator, who has operated their data center with Softlayer, hijacked her domain.  First Defendant mapped Plaintiff to the above IP of their bulk-email operation (WebsiteWelcome.Com) and then uploaded her content to it.").  Less clear from the amended complaint are the allegations against Wired Tree, but certain statements indicate that Gench believes Wired Tree engaged in similar conduct, or was somehow involved with this scheme of HostGator and eNom's.  See, e.g., id. at 9 ("Plaintiff is being hijacked by Wired Tree mapping her to SiteGap.Com; then Hostgator to WebsiteWelcome.Com, and Liquid Web to Wired Tree-Site Gap . . . ."); id. at 16 ("[A]fter the date Plaintiff migrated to Wired Tree, all Defendants conspired in unauthorized transfers . . . .").

The amended complaint also alleges that HostGator's hosting of the site resulted in the site's IP address "revers[ing]" to some other location — apparently because HostGator "never provided a dedicated IP."  Am. Compl. at 6, 12.  Perhaps relatedly, Gench alleges that "her site was uploaded to a domain under the name, http://150.22.194.100-static-reverse.softlayer.com, a mask shielding the host(s) where WebsiteWelcome.Com, the Hostgator bulk email vendor, has operated."  Id. at 6.

    1.    Trademark Infringement

Federal law protects trademarks from infringement in the form of "colorable imitations of the mark which are 'likely to cause confusion, or to cause mistake, or to deceive.'"  Hormel

Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 502 (2d Cir. 1996) (quoting 15 U.S.C. § 1114(1)). To state a claim for trademark infringement, a plaintiff must show that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services, (5) without the plaintiff's consent." 1-800 Contacts, Inc. v. WhenU.Com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005) (internal punctuation omitted) (stating that these requirements apply to both registered and unregistered trademarks).

Thus, apart from issues of protectability and likelihood of confusion, a plaintiff must show that the defendant "use[d] the mark in commerce." 15 U.S.C. § 1114(1)(a). In the context of services, a mark is deemed to be in used in commerce

> when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

15 U.S.C. § 1127. Thus, to be liable for trademark infringement, the defendant must have "used or displayed" the mark to advertise or sell services that it in fact renders in commerce.

While the defendants dispute that Gench's domain name constitutes a protectible mark, it is not necessary to reach this question inasmuch as the amended complaint does not contain coherent and non-conclusory allegations that the defendants used the mark to advertise or sell any commercial services they rendered. Rather, the amended complaint alleges at most that the defendants, through their alleged errors in hosting the site, made it hard or impossible for persons seeking to reach the site or plaintiff to do so. Such allegations do not show that the defendants used Gench's domain name to sell or advertise goods or services.

The Court recognizes that the amended complaint contains loaded words like "forged," Am. Compl. at 9 ("Defendants forged the MX-Email Exchange protocol, an integral part of the DNS, by redirecting OnlineTutorForEnglish.Com to the aforementioned mask or WebSiteWelcome.Com and, as a result, Plaintiff has lost email addresses of all her clients to Defendant."); "conspired," id. at 16 ("[A]ll Defendants conspired in unauthorized transfers . . . ."); and "hijacked," e.g., id. at 7 ("Hostgator hijacked her domain through social engineering or impersonation . . . ."). But the allegations that accompany them are devoid of non-conclusory descriptions of the defendants' conduct that show actual use of the domain name to sell or advertise goods. Gench's clearest arguments have nothing to do with any of her federal claims, but instead constitute complaints that the defendants did not provide her with the services she expected. See, e.g., id. at 5 ("Enom didn't lift the blockage for Plaintiff to be able to change her password.").

Gench also claims that the defendants redirected the domain to a "mask" site operated by Site Gap, or to an email distributor controlled by HostGator. See id. at 6-7, 9, 12, 15. But there are no non-conclusory allegations of what resulted from this alleged conduct. Gench seems to think that emails intended for her were misdirected to HostGator or an associated entity, see id. at 9, but these allegations do not show that the defendants used Gench's trademark to advertise or sell services.

We therefore find that the amended complaint does not plausibly allege that the defendants used the mark in commerce, and that Gench therefore has not pled one of the necessary elements to state a claim for trademark infringement.

For similar reasons, the amended complaint does not plausibly allege contributory trademark infringement. To be liable for contributory trademark infringement, a service-

provider defendant must have intentionally induced another to engage in infringing activities, or continued to supply its services to one whom it knows or has reason to know is engaging in such activities. See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854 (1982), accord Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93, 106 (2d Cir. 2010). The amended complaint does not allege facts that plausibly show that any entity or individual was actually engaging in trademark infringement. A fortiori, it fails to show that any of the defendants knew or reasonably should have known about infringing activity by any other entities or individuals.[4]

Accordingly, the amended complaint does not state a claim of trademark infringement.

2. Trademark Dilution

Under federal law, a plaintiff who owns a "famous mark" may enjoin a defendant from "us[ing] . . . a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment" of that mark. 15 U.S.C. § 1125(c)(1). The same definition of "use in commerce" discussed above applies here. See 15 U.S.C. § 1127. Accordingly, for the reasons just discussed, Gench has not stated a claim for trademark dilution against the defendants.

3. False Designation of Origin and False Description

Federal trademark law also prohibits the false designation of origin and false descriptions of goods or services by use of a mark in commerce. See 15 U.S.C. § 1125(a)(1); 20th Century Wear, Inc. v. Sanmark-Stardust Inc., 747 F.2d 81, 91 (2d Cir. 1984) (citation and footnote omitted). Once again, the same definition of "use in commerce" applies to these claims as

---

[4] At various points in her opposition papers, Gench argues that the defendants' motions to dismiss should be denied due to the defendants' "failure to join" other parties. E.g., Pl. Opp'n to Wired Tree at 1-2; Pl. Opp'n to HostGator at 3, 6; see Pl. Opp'n to eNom at 14-15. The Court is unaware of any rule, however, that requires a party who makes a motion to dismiss for failure to state a claim to "join" another party in order to pursue such a motion.

applies to trademark infringement. See 15 U.S.C. § 1127. Therefore, the defendants may not be held liable for false designation of origin and false description.

    4.    Cybersquatting

Gench alleges that the defendants have violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"), which aims to prevent cybersquatting, or "the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners." Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 493 (2d Cir. 2000). Gench apparently claims that all three defendants violated the ACPA, see Am. Compl. at 8, 11, but her claims against eNom are the clearest, see id.; Ex. 27 to Am. Compl. According to Gench, eNom violated the ACPA by advertising misspelled versions of her domain name "OnlineTutorForEnglish.com" for sale. Am. Compl. at 11 (alleging that eNom offered for sale domain names confusingly similar to her own via "Name.Com, an Enom-owned bulk domain retailer"); Ex. 27 to Am. Compl. (screenshot of Whois lookup offering such domain names as "OnlineTutorsForENglSh" and "NetTutorForENglSh" for sale, apparently by eNom); Ex. 39 to Am. Compl. (screenshot of Whois lookup showing that the domain name "Onlinetutorsforenglish.com" was available for purchase from an unidentified vendor).

A violation of the ACPA occurs where a defendant, acting with "bad faith intent," "registers, traffics in, or uses a domain name" that is "identical or confusingly similar" to a distinctive or famous mark. 15 U.S.C. § 1125(d)(1)(A). "Bad faith" is determined by looking to nine statutory factors, among other considerations. See 15 U.S.C. § 1125(d)(1)(B)(i). A court must analyze each case based on its "unique circumstances," Sporty's Farm, 202 F.3d at 499, to determine "how close a defendant's conduct falls to the ACPA's heartland" — the clearest

example of which is the situation where a defendant registers an established entity's domain name in bad faith and offers to sell it to the entity for an "exorbitant price," Gioconda Law Grp. PLLC v. Kenzie, 941 F. Supp. 2d 424, 433 (S.D.N.Y. 2013) (citation and quotation marks omitted). A separate section provides that "[a] person shall be liable for using a domain name . . . only if that person is the domain name registrant or that registrant's authorized licensee." 15 U.S.C. § 1125(d)(1)(D).

Here, Gench does not allege that any of the defendants are the "registrant" (or the authorized licensee of the registrant) of her domain name or any confusingly similar names. Indeed, as to her own domain name, she explicitly concedes that she "is the owner of the domain, who has registered it several years lawfully," Am. Compl. at 6, that she "registered her domain every year," and that "[s]he has lawfully registered her domain as the verified owner or 'authorized registrant,'" Pl. Opp'n to HostGator at 12; see also Exs. 11, 13, 14 (descriptive information about Gench's domain name in which none of the defendants is listed as the "registrant"). As to the other domain names allegedly similar to Gench's own, see Am. Compl. at 11, the amended complaint is devoid of any allegations that the defendants are the registrants of such names. Accordingly, the amended complaint does not satisfy the explicit limitation contained in 15 U.S.C. § 1125(d)(1)(D). See, e.g., Petroliam Nasional Berhad v. GoDaddy.com, Inc., 897 F. Supp. 2d 856, 866 (N.D. Ca. 2012) (domain name registrar who routed disputed domain names was not liable for cybersquatting because "only the domain name registrant . . . can 'use' a domain name for purposes of the ACPA") (citations omitted), aff'd, 737 F.3d 546 (9th Cir. 2013), cert. denied, 135 S. Ct. 55 (2014).

Additionally, given that Gench's claims are based primarily on her dissatisfaction with the service she received from the defendants as the hosts of her site, none of the allegations plausibly show "bad faith" as required by the statute.

Accordingly, Gench has not stated a claim under the ACPA against the defendants.[5]

B. Copyright Infringement

Gench alleges that the defendants have violated her rights under the Copyright Act, 17 U.S.C. §§ 101 et seq. See Am. Compl. at 5, 7, 10-12. To state a claim for copyright infringement, a plaintiff must prove two elements: first, "ownership of a valid copyright"; and second, "copying of constituent elements of the work that are original." E.g., Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991)) (quotation marks omitted). To establish the second element, a plaintiff must show, inter alia, that the defendant "actually copied" the work. E.g., Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001); accord Shine v. Childs, 382 F. Supp. 2d 602, 607 (S.D.N.Y. 2005). For the purposes of the Copyright Act, "copies" are "material objects . . . in which a work is fixed by any method . . . , and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 101. Once actual copying is established, a plaintiff must "show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected

---

[5] The amended complaint asserts that eNom "violated the compliance agreement of ICANN" by "[g]iving access to unauthorized third-party registrants but blocking Plaintiff from full access to her password and records." Am. Compl. at 5. The citation contained in the amended complaint — 15 U.S.C. § 1125(d)(1)(A)(I)(ii)(B)(V)(VII) — does not exist. And the Court is unaware of any federal statute that provides a private right of action for the claim Gench asserts.

material exists between the two works." Laureyssens v. Idea Grp., Inc., 964 F.2d 131, 140 (2d Cir. 1992).

While the amended complaint references federal copyright law in general, see Am. Compl. at 3-5, 10-12, it does not describe in any intelligible way the particular infringement that allegedly occurred. Gench has alleged that she registered the content of the site with the U.S. Copyright Office. See id. at 5; Ex. 7 to Am. Compl. (certificate of registration for the "work" entitled "Online Tutor For English" and a list of its contents). But her amended complaint does not show that any of the defendants actually copied this work or produced an infringing work themselves. Instead, Gench's copyright claim seems to be that HostGator, "[w]ith the conspiracy of Enom," Am. Compl. at 7, uploaded the site to an incorrect server under a "mask" domain name which "never reversed to Plaintiff," id. at 12; see id. at 11-12. The amended complaint alleges in a conclusory manner that this caused users to be directed to a different website that was "unaffiliated with OnlineTutorForEnglish.Com," id. at 7, allowing "criminal host(s) to steal the site content," id. at 12, and "manipulate users' web activity," id. at 7; see also id. at 24 ("[T]he plaintiff's site has fallen off into the hands of hackers."). It also claims that this caused Gench to lose her clients' email addresses, to lose control of her email account, and to be subject to email spam. See id. at 9, 17, 24.

These allegations are too vague, conclusory and unintelligible to allow a finding that the elements of a copyright claim have been met. The allegations seem to relate to how the site was hosted — that is, through certain servers, under certain domain names, and using certain IP addresses. See, e.g., id. at 6 ("Hostgator never provided a dedicated IP, resulting in a calamity of successive infringing . . . ."); id. at 7 ("Plaintiff complained to Hostgator that her name servers pointed to Softlayer.Com . . . ."); id. at 21 (complaining that Wired Tree caused the site to map

to SiteGap.Com because it had "not configured the server properly"). In other words, Gench seems to assume that because she perceived the defendants to have improperly hosted the site, the site's copyrighted content must necessarily have been appropriated by "criminal host(s)." Id. at 12.

We find that no copyright claim has been made. There are simply no intelligible allegations that any of the defendants copied the site's content, produced an infringing work, or took any voluntary action to cause an infringing work to be produced. See Wolk v. Kodak Imaging Network, Inc., 840 F. Supp. 2d 724, 742 (S.D.N.Y. 2012) ("Direct liability requires 'volitional conduct' that 'causes' the infringement.") (quoting Cartoon Network LP v. CAC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008)), aff'd, 569 F. App'x 51 (2d Cir. 2014); see also CoStar Grp., Inc. v. LoopNet, Inc., 373 F.3d 544, 549 (4th Cir. 2004) (the Copyright Act "requires conduct by a person who causes in some meaningful way an infringement") (emphasis in original).

Nor can the amended complaint be construed to raise claims of contributory copyright infringement, which arises where a defendant "intentionally induc[es] or encourag[es] direct infringement," or vicarious infringement, which occurs by "profiting from direct infringement while declining to exercise a right to stop or limit it." Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) (citations omitted). To state a claim for contributory copyright infringement, a plaintiff must allege "that a party with knowledge of the infringing activity[] induce[d], cause[d], or materially contribut[ed] to the infringing conduct of another." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citation, quotation marks, and emphasis omitted); see Newborn v. Yahoo!, Inc., 391 F. Supp. 2d 181, 186-88 (D.D.C. 2005) (dismissing claim of contributory copyright infringement in part because of vagueness). To be

17

liable for contributory copyright infringement, a defendant must have "more than a generalized knowledge . . . of the possibility of infringement." Luvdarts, LLC v. AT&T Mobility, LLC, 710 F.3d 1068, 1072 (9th Cir. 2013); see Livnat v. Lavi, 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2, 1998) ("Knowledge of the infringing activity may be actual or constructive. However, one who furnishes a copyrighted work to another but is innocent of any knowledge of the other party's intended illegitimate use will not be liable.") (citations omitted).

Here, the amended complaint alleges no facts that would support the assertion that the defendants knew or should have known about the actions of the "criminal" third parties. Nor does it explain how the "criminal" third parties engaged in copyright infringement, or how the defendants might have profited from any such infringement. Gench's speculation that her website has "fallen into the hands of hackers," because it does not have a "dedicated IP," Am. Compl. at 24, is insufficient to show that any person or entity appropriated her copyrighted content.

In sum, Gench has not stated a claim of copyright infringement against any of these three defendants.

    C.    New York State False Advertising Claim

The amended complaint also purports to allege a claim arising purely under New York law: that is, a claim for false advertising under N.Y. Gen. Bus. L. §§ 350, 350-a (McKinney 2014). See id. at 3, 12-13. Federal courts have "supplemental jurisdiction" over state law claims if they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III." 28 U.S.C. § 1367(a). Nonetheless, a district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." Id. § 1367(c)(3); accord United Mine Workers of Am. v.

Gibbs, 383 U.S. 715, 726 (1966) (state claims "should be dismissed" if federal claims are dismissed before trial); In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 61 (2d Cir. 1998); Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995). Here, all of Gench's federal claims should be dismissed. Thus, the Court should decline to exercise supplemental jurisdiction over her state law claim.

IV. CONCLUSION

For the foregoing reasons, the motions to dismiss filed by HostGator, Wired Tree and eNom (Docket ## 14, 22, 23, 63) should be granted.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Ronnie Abrams at 40 Foley Square, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Abrams. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: February 11, 2015
       New York, New York

                                           GABRIEL W. GORENSTEIN
                                           United States Magistrate Judge

Copy sent to:

Susen Gench
Apt. 2J
82-45 135th Street
Kew Gardens, NY 11435

20