UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
SUSEN GENCH,                                          :

                Plaintiff,                     :          REPORT AND
                                        RECOMMENDATION

    -v.-                                            :
                                         14 Civ. 3592 (RA) (GWG)

HOSTGATOR.COM LLC, et al.,                           :

                Defendants.                     :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Susen Gench filed suit against defendants HostGator.com LLC ("HostGator");

Wired Tree; eNom Incorporated ("eNom"); Liquid Web Incorporated ("Liquid Web"); and an

entity referred to as "SiteGap.Com; SiteGap.Net; SiteGap" ("Site Gap"), alleging violations of

federal trademark and copyright law and New York's law against false advertising.  A default

was entered against Liquid Web on June 25, 2014.  Liquid Web has moved to set aside the

default and to dismiss the complaint against it.[1]  For the reasons that follow, these motions

---

[1]  See Notice of Defendant Liquid Web Inc.'s Motion to Set Aside Entry of Default, filed
Jan. 30, 2015 (Docket # 103); Memorandum in Support of Defendant Liquid Web Inc.'s Motion
to Set Aside Entry of Default, filed Jan. 30, 2015 (Docket # 104) ("Def. Default Mem.");
Declaration of Travis Stoliker in Support of Defendant Liquid Web Inc.'s Motion to Set Aside
Entry of Default, filed Jan. 30, 2015 (Docket # 105) ("Stoliker Decl."); Notice of Defendant
Liquid Web Inc.'s Motion to Dismiss Pursuant to Rule 12(b)(6), filed Jan. 30, 2015 (Docket
# 107); Memorandum of Law in Support of Defendant Liquid Web Inc.'s Motion to Dismiss
Pursuant to Rule 12(b)(6), filed Jan. 30, 2015 (Docket # 108) ("Def. 12(b)(6) Mem."); Letter
from Susen Gench, dated Mar. 15, 2015 and filed Mar. 17, 2015 (Docket # 117) ("Pl. Default
Opp'n"); Affidavit for Order to Show Cause for Default Judgment Against Defendant Liquid
Web, Inc., dated Mar. 28, 2015 (attached to Order, dated Apr. 1, 2015 (Docket # 122)) ("Pl.
Second Opp'n"); Reply Memorandum in Support of Defendant Liquid Web Inc.'s Motion to Set
Aside Entry of Default, filed Mar. 30, 2015 (Docket # 119) ("Def. Default Reply"); Reply
Memorandum in Support of Defendant Liquid Web Inc.'s Motion to Set Aside Entry of Default
and Motion to Dismiss, filed Apr. 14, 2015 (Docket # 124) ("Def. Second Reply"); Plaintiff's
Motion Against Liquid Web, Pursuant to Rule 9(b), for Malicious Intent and Fraud.  Dismiss All

should be granted.

I.      BACKGROUND

        A.      Facts Alleged in the Amended Complaint

        For the purpose of deciding Liquid Web's motion to dismiss, the Court assumes that the

factual allegations in Gench's amended complaint are true and draws all reasonable inferences in

her favor.  See, e.g., Steginsky v. Xcelera Inc., 741 F.3d 365, 368 (2d Cir. 2014) (citation

omitted).  We also consider the documents attached to the complaint as exhibits.  See Fed. R.

Civ. P. 10(c); Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (quoting Cortec

Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991)).

        On September 12, 2007, Gench registered the domain name OnlineTutorForEnglish.com

(the "domain") with an entity called "Tucows."  See Amended Complaint, filed May 23, 2014

(Docket # 5) ("Am. Compl."), at 4; but see Ex. 2 to Am. Compl. (reflecting a registration date of

September 12, 2006).  Since then, Gench has operated the OnlineTutorForEnglish.com website

(the "site").  See Am. Compl. at 4-5, 10.  The site provides tutoring by native English speakers

and other English-language learning resources.  See id. at 10.  The site offers its users the

opportunity to "live-chat" with tutors through the use of a console installed on Gench's

computer.  See id. at 5.  Gench has advertised the site in various media, including via Google

AdWords, Yahoo!, and LinkedIn.  See id. at 4.  Gench has also produced other content bearing

the name "Online Tutor For English," including videos published on YouTube and articles

Motions: Docket Entry 124.  Dismiss to Set Aside the Default Judgment: Docket Entry 103.
Dismiss: 12(b)(6): Docket 107.  Grant the Proposed Affidavit for Default Judgment, dated Apr.
27, 2015 (Docket # 132) ("Pl Third Opp'n"); Defendant Liquid Web Inc.'s Opposition to
Plaintiff's Motion Against Liquid Web, filed May 28, 2015 (Docket # 129) ("Def. Third
Reply"); Plaintiff's Motion Requesting to Docket Motion 129-1 Separate and Full: Docket 174
Pages Filed, dated June 5, 2015 (Docket # 133) ("Pl. Fourth Opp'n").

published on the site and on other websites.  See id. at 4-5.  Gench makes income from the site

from advertisements, tutorial purchases, and online tutoring purchases.  See id. at 10.

On July 6 or 7, 2010, Gench enlisted Wired Tree to host the site.  See id. at 14-15, 21.  In

January 2011, Gench transferred the site from Wired Tree to HostGator.  See id. at 5-6, 21.  In

September 2011, Gench transferred her site to eNom, but in either February or March 2012, she

transferred it back to HostGator.  See id. at 5, 10.  At some point thereafter, Gench became

dissatisfied with HostGator's service, and she requested that the site be transferred back to

eNom, though this transfer was never completed, or was completed and subsequently reversed.

See id. at 5, 12-13, 15.  On September 7, 2013, Gench temporarily transferred the site to a

company called In Motion Hosting.  See id. at 8.  On November 1, 2013, Gench transferred the

site to Liquid Web for hosting.  See id.  Soon thereafter, she encountered problems updating the

site's name server because the "MX record" still reflected that it was being hosted by HostGator.

See id.; Exs. 23-24 to Am. Compl.; see also Am. Compl. at 17-18 ("Defendants specified

multiple name servers for the MX record," which manipulation caused the site to "suffer[]

inundated spam" and caused Gench to not receive emails from clients to her site's inbox).

HostGator had suspended the site, however, so on November 1, 2013, "to circumvent the

suspension gridlock," Gench temporarily replaced the site's private name servers with Liquid

Web's name servers.  Am. Compl. at 13-14.  She then changed back to using private name

servers on November 20, 2013.  See id. at 14; Ex. 53 to Am. Compl.

Gench paid Liquid Web for a dedicated server to host her site and a dedicated IP address.

See Am. Compl. at 8, 13-14.  The amended complaint alleges that she received neither.  See id.

at 19.  As of April 2014, instead of "pointing" to Gench's domain, the site's IP address pointed

to "host2.sitegap.com" or "host3.sitegap.com," which in turn "mapped" to

3

"ns2.onlinetutorforenglish.com."  Id. at 13-14 (capitalization omitted); see Exs. 52-53 to Am.
Compl.; see also Ex. 70 to Am. Compl. (as of March 2014, the domain was hosted from an IP
address that also hosted other domains); Ex. 71 to Am. Compl. at 1, 4 (Liquid Web tech support
responses explaining that "most IP addresses in circulation have already been used by other
domains, and anyone can register any domain to point to any IP address regardless of whether or
not they own it" and that "[o]ther domains that point to your IP . . . are not malicious").  The
domain "OnlineTutorForEnglish.com" pointed to an IP address that the site had used previously,
when it had been hosted by Wired Tree.  See Am. Compl. at 14; Ex. 55 to Am. Compl.  Gench
also alleges that instead of providing her with a dedicated server, Liquid Web hosted several
domains on one server.  See Am. Compl. at 14, 16, 20.  Gench seems to allege that these
difficulties stemmed from the fact that HostGator "still held" the site as late as January 2014.
See Am. Compl. at 15-16; Exs. 63 and 65 to Am. Compl.  According to Gench, all of the
defendants "conspired in unauthorized transfers."  Am. Compl. at 16.

Gench had various other problems with the services provided by Liquid Web.  See id. at
18 (the "script was again altered on cPanel or the end-user interface," which Gench apparently
believed was related to some action by HostGator); id. (Gench's emails were infected with a
virus, necessitating the removal of the infected emails); id. at 20 (after a server reboot to protect
against a virus, the site's home page returned a "Not Found" error message); id. at 20-21 (the
server was down for two hours on April 26, 2014, but Liquid Web did not disclose this to
Gench).  She was dissatisfied with the technical support provided by Liquid Web in response to
her complaints.  See, e.g., id. at 18 ("Online technician[s] from different locations replied to
tickets immediately but nevertheless [were] mostly ineffective[]" because they were "unfamiliar
with the ticket matter" and "lacked adequate expertise"); id. at 20 (Liquid Web technicians

4

"replied [to] the tickets immediately," but the support they provided was ultimately "poor and ineffective").

The number of visitors to the site reached a high of 32,203 in February 2012, see id. at 9; Ex. 32 to Am. Compl., but then declined substantially, see Am. Compl. at 9; Exs. 33-36 to Am. Compl. With this loss of traffic, the site also suffered losses in advertisement value, search engine rankings, and overall profitability. See Am. Compl. at 21-22. The site has not operated since May 2, 2014. See id. at 18, 22. Gench asked Liquid Web to fix the issue, see id. at 18, but Liquid Web's technical support staff required her password to access her server, which she apparently refused to provide, see id. at 19; Ex. 83 to Am. Compl.

B.    Procedural History

Gench filed the original complaint in this action on May 19, 2014. See Complaint, filed May 19, 2014 (Docket # 2). On May 23, 2014, Gench filed an amended complaint, which alleges violations of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); the Copyright Act, 17 U.S.C. §§ 101 et seq.; and New York's law against false advertising, N.Y. Gen. Bus. L. §§ 350, 350-a. See Am. Compl. at 3. Annexed to the amended complaint are more than 90 exhibits, comprising nearly 400 pages. On June 2, 2014, a process server served the summons on Nick Campbell, a Liquid Web employee in Michigan. See Summons in a Civil Action, filed June 23, 2014 (Docket # 8), at 2. Gench filed proof of service on June 23, 2014, though only the first two pages of the original complaint and the amended complaint were attached to the summons in that filing. See id. at 4-7. Liquid Web contends that it never received the amended complaint and that while it received other papers in the case, it "did not understand their legal significance" and did not realize that Liquid Web had an obligation to respond. Def. Default Mem. at 2; accord

5

Stoliker Decl. ¶ 6.

At the same time she filed her original complaint, Gench requested a preliminary injunction and temporary restraining order to require the defendants to provide her access to the site and to require them to provide her with certain information about it.  See Order to Show Cause for Preliminary Injunction and Temporary Restraining Order (unsigned), filed May 19, 2014 (Docket # 3); see also Letter addressed to Judge Lewis A. Kaplan from Susen Gench, filed May 23, 2014 (Docket # 4).  By Order dated May 29, 2014 (Docket # 6), Judge Ronnie Abrams denied this request.

On June 25, 2014, the Clerk issued a Certificate of Default (Docket # 13) as to Liquid Web.  Gench made a motion for entry of default judgment against Liquid Web on that same date, see Motion for Default Judgment as to Liquid Web Incorporated, filed June 25, 2014 (Docket # 19), but that document was rejected by the ECF filing system.  Gench requested permission to refile this motion, which was granted.  See Order, dated July 14, 2014 (Docket # 45), at 1-2.  She never refiled the motion, however.  Sometime in mid-January 2015, Liquid Web learned that it was in default when its counsel informed it that the Certificate of Default had been entered against it.  See Def. Default Mem. at 3; Stoliker Decl. ¶ 3.  On January 30, 2015, Liquid Web filed motions to set aside the default and to dismiss the complaint against it pursuant to Fed. R. Civ. P. 12(b)(6) (Docket ## 103, 107).  Shortly thereafter, the Court granted the motions to dismiss of HostGator, Wired Tree, and eNom.  See Report and Recommendation, dated Feb. 11, 2015 (Docket # 111); Order Adopting Report and Recommendation, dated Mar. 10, 2015 (Docket # 115).

On March 17, 2015, Gench faxed to the Chambers of the undersigned a response to Liquid Web's motion to set aside the default.  See Pl. Default Opp'n.  Liquid Web filed a reply

on March 30, 2015.  See Def. Default Reply.  In the interim, however, on March 28, 2015,

Gench had faxed another document to Chambers.  This document was entitled "Affidavit for

Order to Show Cause for Default Judgment Against Defendant Liquid Web, Inc."  See Pl.

Second Opp'n.  In an Order dated March 30, 2015 (Docket # 122), the Court stated it would treat

this document as an additional opposition to Liquid Web's motion and allowed Liquid Web an

opportunity to respond.  Liquid Web filed an additional reply on April 14, 2015.  See Def.

Second Reply.  On April 27, 2015, Gench faxed yet another document to Chambers.  See Pl.

Third Opp'n.  This document was entitled "Plaintiff's Motion Against Liquid Web, Pursuant to

Rule 9(b), for Malicious Intent and Fraud.  Dismiss All Motions: Docket Entry 124.  Dismiss to

Set Aside the Default Judgment: Docket Entry 103.  Dismiss: 12(b)(6): Docket 107.  Grant the

Proposed Affidavit for Default Judgment."  Id.  Gench apparently sent a copy to Liquid Web.

See Affirmation of Service, filed June 1, 2015 (Docket # 131); Def. Third Reply at 2.  Liquid

Web filed a response to this document on May 28, 2015.  See Def. Third Reply. at 1 & n.1.

Finally, on June 5, 2015, Gench faxed another document to Chambers entitled "Plaintiff's

Motion Requesting to Docket Motion 129-1 Separate and Full: Docket 174 Pages Filed."  See Pl.

Fourth Opp'n.[2]  Although Gench's April 27 and June 5 submissions are each styled as a

"motion," we construe them to constitute further opposition to Liquid Web's motions to set aside

the default and to dismiss the complaint.

---

[2]  The Court's repeated efforts to persuade plaintiff to stop faxing unfiled documents to
Chambers, see Order, dated March 31, 2015 (Docket # 122); Order, dated April 8, 2015 (Docket
# 123), have unfortunately been in vain.  Nonetheless, the Court has continued to docket these
faxed documents.  See Docket # 132, 133.

II.    MOTION TO SET ASIDE THE ENTRY OF DEFAULT

    A.    Legal Standard

Under Fed. R. Civ. P. 55, where a defendant fails to "plead or otherwise defend" a case, the clerk of court must enter the defendant's default.  Fed. R. Civ. P. 55(a).[3]  "The court may set aside an entry of default for good cause . . . ."  Fed. R. Civ. P. 55(c).  "Good cause" is assessed by considering three factors: (1) whether the defendant's default was willful, (2) whether setting aside the default would prejudice the plaintiff, and (3) whether the defendant has presented a meritorious defense.  Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 96 (2d Cir. 1993); accord Murray Eng'g, P.C. v. Windermere Props. LLC, 2013 WL 1809637, at *3 (S.D.N.Y. Apr. 30, 2013) (citation omitted); Todtman, Nachamie, Spizz & Johns, P.C. v. Ashraf, 241 F.R.D. 451, 453 (S.D.N.Y. 2007) (citation omitted), aff'd, 316 F. App'x 51 (2d Cir. 2009).  The court may also consider "whether the entry of default would bring about a harsh or unfair result."  Enron Oil Corp., 10 F.3d at 96.  "'[G]ood cause' . . . should be construed generously."  Id. ("[B]ecause defaults are generally disfavored and are reserved for rare occasions, when doubt exists as to whether a default should be granted or vacated, the doubt should be resolved in favor of the defaulting party."); see New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005) (the Second Circuit has "expressed a 'strong preference for resolving disputes on the merits'") (quoting Powerserve Int'l, Inc. v. Lavi, 239 F.3d 508, 514 (2d Cir. 2001)).

    B.    Discussion

As to the issue of willfulness, Gench asserts that she served Liquid Web with the

---

[3]  A plaintiff may thereafter seek a default judgment, see Fed. R. Civ. P. 55(b)(2), though Gench never made such a motion here prior to the time Liquid Web appeared.  While Gench now requests that a default judgment enter against Liquid Web, see Pl. Second Opp'n at 2-6, the request must be denied because, for the reasons stated below, the default must be set aside.

amended complaint and that its statements to the contrary are false.  See Pl. Default Opp'n at 1-2; Pl. Second Opp'n at 1-2; Pl. Third Opp'n at 1-2.  She also argues that Liquid Web's failure to respond to any of her other submissions shows that it was "deliberately 'stalling for time,'" see Pl. Default Opp'n at 2-3, and points to the fact that Liquid Web did not file its motion to vacate the default until several months after the complaint was filed as further evidence of willfulness, see Pl. Third Opp'n at 1.  In the context of a default, "willfulness" refers to "conduct that is more than merely negligent or careless" — specifically to conduct that is "egregious and . . . not satisfactorily explained."  SEC v. McNulty, 137 F.3d 732, 738 (2d Cir. 1998) (citing Am. Alliance Ins. Co., Ltd. v. Eagle Ins. Co., 92 F.3d 57, 60-61 (2d Cir. 1996)); accord Gonzalez v. City of New York, 104 F. Supp. 2d 193, 195-96 (S.D.N.Y. 2000) (citing cases).  Liquid Web has explained its default by claiming that it was never served with the complete amended complaint, see Def. Default Mem. at 1-2; accord Stoliker Decl. ¶ 6, which finds some support in the record inasmuch as only the first two pages of the complaint and the first two pages of the amended complaint are annexed to the proof of service submitted by Gench, see Summons in a Civil Action, filed June 23, 2014 (Docket # 8).  Liquid Web, however, acknowledges that it later received subsequent documents from Gench that it did not respond to because "they often were hand-written and never appeared to require any response from Liquid Web," Def. Default Mem. at 2; accord Stoliker Decl. ¶ 6.  It fails to explain, however, why it did not make inquiry as to the status of the lawsuit.  In the end, there appears to be a factual dispute as to whether Liquid Web was served with the amended complaint.  Rather than resolve this dispute, we will instead assume — solely for the purposes of resolving this motion — that its default was  "willful" since this assumption makes no difference to the outcome of the motion.

        With respect to the second factor, "delay standing alone does not establish prejudice."

Enron Oil Corp., 10 F.3d at 98 (citing Davis v. Musler, 713 F.2d 907, 916 (2d Cir. 1983)).

Gench has not alleged any specific prejudice that she would suffer as a result of setting aside the

default.  The usual source of prejudice — a delay in obtaining discovery and resolving the case

— is absent here inasmuch as the Court previously stayed all discovery until the defendants'

respective motions to dismiss were disposed of.  See Order, dated July 14, 2015 (Docket # 45),

at 2.

Finally, as to the "meritorious defense" factor, "[t]he test of such a defense is measured

not by whether there is a likelihood that it will carry the day, but whether the evidence

submitted, if proven at trial, would constitute a complete defense." Enron Oil Corp., 10 F.3d at

98 (citations omitted); accord McNulty, 137 F.3d at 740.  The defaulting defendant "need only

meet a low threshold to satisfy this factor." MD Produce Corp. v. 231 Food Corp., 304 F.R.D.

107, 110 (E.D.N.Y. 2014) (citing cases) (internal quotation marks omitted); see Am. Alliance

Ins. Co., 92 F.3d at 61 (the defense "need not be ultimately persuasive at this stage" to satisfy

this factor).  As discussed below, Gench has not stated a claim against Liquid Web and thus

Liquid Web's defense plainly satisfies the third factor.

In sum, while we have assumed that the willfulness factor favors maintaining the entry of

default against Liquid Web, the remaining factors strongly weigh in favor of setting aside the

default.  In light of the Second Circuit's statement that "good cause . . . should be construed

generously," Enron Oil Corp., 10 F.3d at 96, and the fact that the remaining factors so strongly

favor Liquid Web, we conclude that Liquid Web has shown good cause to set aside the entry of

default.  This result is particularly warranted given that we are considering the vacatur of an

entry of default, rather than of a default judgment.  See Green, 420 F.3d at 109 (citing and

construing Fed. R. Civ. P. 55(c) and 60(b)); Meehan v. Snow, 652 F.2d 274, 276 (2d Cir. 1981)

("[T]he standard for setting aside the entry of a default pursuant to Rule 55(c) is less rigorous than the 'excusable neglect' standard for setting aside a default judgment by motion pursuant to Rule 60(b).").  Case law has also recognized that a finding of willfulness will not prevent the setting aside of an entry of default where the other factors are in a defendant's favor.  See, e.g., Grant v. City of New York, 145 F.R.D. 325, 327 (S.D.N.Y. 1992) ("Although the first factor, willfulness of default, advises against the defendant, the other considerations support her. Strong policies favoring the resolution of disputes on their merits command that this apparently equivocal outcome be resolved in [the defendant's] favor.") (footnote and citations omitted); see also Wagstaff-EL v. Carlton Press Co., 913 F.2d 56 (2d Cir. 1990) (upholding vacatur of default judgment under the more stringent standard of Rule 60(b) where the defendant's conduct was willful but other factors strongly favored vacatur); Kuklachev v. Gelfman, 2009 WL 497576, at *2-4 (E.D.N.Y. Feb. 26, 2009) ("Even if one factor weighs against vacating the default, if the other factors support it, the presumption in favor of resolution on the merits requires that the court vacate the default.").

Accordingly, the entry of default should be vacated.

III.   MOTION TO DISMISS

A.   Legal Standard

A party may move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) where the opposing party's pleading "fail[s] to state a claim upon which relief can be granted."  While a court must accept as true all of the allegations contained in a complaint, that principle does not apply to legal conclusions.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do.") (citation, internal quotation marks, and alteration omitted).  In

other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice," Iqbal, 556 U.S. at 678 (citation omitted), and thus a

court's first task is to disregard any conclusory statements in a complaint, see id. at 679.

 Next, a court must determine if a complaint contains "sufficient factual matter" which, if

accepted as true, states a claim that is "plausible on its face."  Id. at 678 (citation and quotation

marks omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d

Cir. 2007) ("[A] complaint must allege facts that are not merely consistent with the conclusion

that the defendant violated the law, but which actively and plausibly suggest that conclusion.")

(citation omitted).  A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more

than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (citations

and internal quotation marks omitted).  "[W]here the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R.

Civ. P. 8(a) because it has merely "alleged" — but not "'show[n]'—'that the pleader is entitled

to relief.'"  Id. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

 In the case of pro se plaintiffs, "[a] document filed pro se is to be liberally construed, and

a pro se complaint, however inartfully pleaded, must be held to less stringent standards than

formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam)

(citations and internal quotation marks omitted); accord McPherson v. Coombe, 174 F.3d 276,

280 (2d Cir. 1999) (a pro se party's pleadings should be construed liberally and interpreted "'to

raise the strongest arguments that they suggest'") (quoting Burgos v. Hopkins, 14 F.3d 787, 790

(2d Cir. 1994)).  However, even <u>pro se</u> pleadings must contain factual allegations that "'raise a

right to relief above the speculative level.'"  <u>Dawkins v. Gonyea</u>, 646 F. Supp. 2d 594, 603

(S.D.N.Y. 2009) (quoting <u>Twombly</u>, 550 U.S. at 555).

     B.     <u>Trademark-Related Claims</u>

We read Gench's amended complaint to raise various claims under Section 43(a) of the

Lanham Act: trademark infringement, trademark dilution, false designation of origin and false

description, and cybersquatting.  Gench's trademark-related claims stem from the assertion that

HostGator, with the help of eNom — two defendants whose motions to dismiss have been

granted — transferred the site or "domain" to itself or its CEO, somehow falsified the record of

this transfer, and attempted to conceal these facts from Gench.  <u>See</u> Am. Compl. at 5-8, 15.  The

trademark-related allegation against Liquid Web seems to be that Liquid Web hosted the site on

a shared server in order to transfer the site to some other party, or to allow HostGator to transfer

the site to itself with the help of eNom.[4]  We address each trademark-related claim, as best we

---

    [4]  <u>See</u>, <u>e.g.</u>, <u>id.</u> at 9 ("Plaintiff is being hijacked by Wired Tree mapping her site to
SiteGap.Com; then Hostgator to WebsiteWelcome.Com, and Liquid Web to Wired Tree-Site
Gap."); <u>id.</u> at 16 ("On January 5, 2014, Plaintiff [sic] still pointed to Site Gap-Wired Tree.
Hostgator held her domain; Liquid Web pointed her to all these Defendants using her Email
Exchange — PTR or Secondary IP."); <u>id.</u> (Liquid Web "pointed Plaintiff to their shared server to
leave out her private name servers to the defendants, facilitating the mapping of the defendants
to transfer her domain."); <u>id.</u> (Liquid Web acted "in order to accommodate Defendants to sustain
NS2.ONLINETUTORFORENGLISH.COM ([Gench's] private server), mapped to them, as well
as helped to transfer Plaintiff out easily."); <u>id.</u> at 18 ("On April 2, 2014 cPanel was replaced,
meaning that the host has changed so Plaintiff is not hosted on the Liquid Web server.  This was
an unauthorized transfer again but Liquid Web never disclosed it to Plaintiff."); <u>id.</u> ("[T]he
WHM showed no IP address exists on the defendant [Liquid Web]'s server, meaning that
Plaintiff is pointed to another host outside Liquid Web."); <u>see also</u> Pl. Second Opp'n at 3
(asserting that "[t]he Defendants . . . have consistently transferred the site to several others" and
that Liquid Web in particular has allowed the site to be "transferred to other hosts from the
Liquid Web server"); <u>id.</u> at 5 ("Liquid Web . . . conspired with WiredTree, Hostgator, an eNom
domain reseller . . . in unauthorized transfer registrations for SiteGap.Com.") (emphases
omitted).

can construe them, in turn.

1.   <u>Trademark Infringement</u>

Federal law protects trademarks from infringement in the form of "colorable imitations of the mark which are 'likely to cause confusion, or to cause mistake, or to deceive.'" <u>Hormel Foods Corp. v. Jim Henson Prods., Inc.</u>, 73 F.3d 497, 502 (2d Cir. 1996) (quoting 15 U.S.C. § 1114(1)).  To state a claim for trademark infringement, a plaintiff must show that "(1) it has a valid mark that is entitled to protection under the Lanham Act; and that (2) the defendant used the mark, (3) in commerce, (4) in connection with the sale or advertising of goods or services, (5) without the plaintiff's consent."  <u>1-800 Contacts, Inc. v. WhenU.Com, Inc.</u>, 414 F.3d 400, 406-07 (2d Cir. 2005) (quoting 15 U.S.C. § 1114(1)(a)) (internal punctuation and citations omitted) (stating that these requirements apply to both registered and unregistered trademarks).

Thus, apart from issues of protectability and likelihood of confusion, a plaintiff must show that the defendant "use[d]" the mark "in commerce."  15 U.S.C. § 1114(1)(a).  In the context of services, a mark is deemed to be in "use[d] in commerce"

> when it is used or displayed in the sale or advertising of services and the services
> are rendered in commerce, or the services are rendered in more than one State or
> in the United States and a foreign country and the person rendering the services is
> engaged in commerce in connection with the services.

15 U.S.C. § 1127.  Thus, to be liable for trademark infringement, the defendant must have "used or displayed" the mark to advertise or sell services that it in fact renders in commerce.

While Liquid Web disputes that Gench's unregistered trademark "Online Tutor for English" or her site's domain name "OnlineTutorForEnglish.com" constitute a protectible mark, <u>see</u> Def. 12(b)(6) Mem. at 4-5, it is not necessary to reach this question inasmuch as the

14

amended complaint does not contain coherent and non-conclusory allegations that Liquid Web used the mark to advertise or sell commercial services.  Rather, the amended complaint alleges at most that Liquid Web, through its alleged errors in hosting and providing an IP address for the site, made it hard or impossible for persons seeking to reach the site or to email Gench through the site to do so.  Such allegations do not show that Liquid Web used Gench's domain name to sell or advertise goods or services.

For similar reasons, the amended complaint does not plausibly allege contributory trademark infringement.  To be liable for contributory trademark infringement, a service-provider defendant must have intentionally induced another to engage in infringing activities, or continued to supply its services to one whom it knows or has reason to know is engaging in such activities.  See Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 854 (1982) (discussing distributors of products); Tiffany (NJ) Inc. v. eBay, Inc., 600 F.3d 93, 106 (2d Cir. 2010) (applying Inwood to service providers).  The amended complaint does not allege facts showing that any entity or individual was actually engaging in trademark infringement.  A fortiori, it fails to show that Liquid Web knew or reasonably should have known about infringing activity by any other entities or individuals.

Accordingly, the amended complaint does not state a claim for trademark infringement against Liquid Web.

### 2.    Trademark Dilution

Under federal law, a plaintiff who owns a "famous mark" may enjoin a defendant from "us[ing] . . . a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment" of that mark.  15 U.S.C. § 1125(c)(1).  The same definition of "use in commerce" discussed above applies here.  See 15 U.S.C. § 1127.  Accordingly, for the reasons

just discussed, Gench has not stated a claim for trademark dilution against Liquid Web.

3.  False Designation of Origin and False Description

Federal trademark law also prohibits the false designation of origin and false descriptions of goods or services by use of a mark in commerce.  See 15 U.S.C. § 1125(a)(1); 20th Century Wear, Inc. v. Sanmark-Stardust Inc., 747 F.2d 81, 91 (2d Cir. 1984) (citation and footnote omitted).  Once again, the same definition of "use in commerce" applies to these claims as applies to trademark infringement.  See 15 U.S.C. § 1127.  Therefore, Gench has not stated a claim for false designation of origin or false description against Liquid Web.

4.  Cybersquatting

Gench alleges that Liquid Web has violated the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"), which aims to prevent cybersquatting, or "the registration as domain names of well-known trademarks by non-trademark holders who then try to sell the names back to the trademark owners."  Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 493 (2d Cir. 2000).  It is difficult to tell what allegations are being made with respect to this statute.  Gench alleges that Liquid Web refused to provide technical support to remedy the site being "down" unless Gench provided it with her password.  Am. Compl. at 19; Ex. 83 to Am. Compl.  Gench refused to do this, see Ex. 83 to Am. Compl. at 2, 6, which meant that her server was "unmanaged," id. at 4-5, so Liquid Web was "unable to investigate the reasons behind [the] recent site downtime," id. at 6.

A violation of the ACPA occurs where a defendant, acting with "bad faith intent," "registers, traffics in, or uses a domain name" that is "identical or confusingly similar" to a distinctive or famous mark.  15 U.S.C. § 1125(d)(1)(A).  "Bad faith" is determined by looking to nine statutory factors, among other considerations.  See 15 U.S.C. § 1125(d)(1)(B)(i).  A court

must analyze each case based on its "unique circumstances," Sporty's Farm, 202 F.3d at 499, to determine "how close a defendant's conduct falls to the ACPA's heartland" — the clearest example of which is the situation where a defendant registers an established entity's domain name in bad faith and offers to sell it to the entity for an "exorbitant price," Gioconda Law Grp. PLLC v. Kenzie, 941 F. Supp. 2d 424, 433 (S.D.N.Y. 2013) (citation and quotation marks omitted).  A defendant "traffics in" a domain name when it engages in certain types of transactions, including but not limited to "sales, purchases, loans, pledges, licenses, exchanges of currency, and any other transfer for consideration or receipt in exchange for consideration."  15 U.S.C. § 1125(d)(1)(E).  A separate section provides that "[a] person shall be liable for using a domain name . . . only if that person is the domain name registrant or that registrant's authorized licensee."  15 U.S.C. § 1125(d)(1)(D).

Gench has not alleged that Liquid Web was the "registrant" (or the authorized licensee of the registrant) of her domain name or any confusingly similar ones.  Indeed, as to her own domain name, she explicitly concedes that she is "the owner of the domain, who has registered it [sic] several years lawfully."  Am. Compl. at 6; see also, e.g., Exs. 11, 13, 14, 54, 56, 59, 60, 62-64, 73, 89, 92 to Am. Compl. (descriptive information about the domain in which none of the defendants is listed as the "registrant").  Thus, Liquid Web cannot be said to have registered or used the domain name in violation of the ACPA.  See, e.g., Petroliam Nasional Berhad v. GoDaddy.com, Inc., 897 F. Supp. 2d 856, 866 (N.D. Ca. 2012) (domain name registrar who routed disputed domain names was not liable for cybersquatting because "[o]nly the domain name registrant . . . can 'use' a domain name for purposes of the ACPA") (citations omitted), aff'd, 737 F.3d 546 (9th Cir. 2013), cert. denied, 135 S. Ct. 55 (2014).

Additionally, there are no comprehensible allegations that Liquid Web participated in

any transaction of the type identified by the statute to constitute "traffic[king] in" the domain name.  See 15 U.S.C. § 1125(d)(1)(E).  In any event, stripped of incendiary language, Gench's claims against Liquid Web are essentially based on her dissatisfaction with the service Liquid Web provided as a host of her site, see Am. Compl. at 13-21, and thus none of the allegations plausibly show the "bad faith" required by the statute, see 15 U.S.C. § 1125(d)(1)(A)(i).

Accordingly, Gench has not stated a claim under the ACPA against Liquid Web.

C.      Copyright Infringement Claim

The amended complaint contains no allegations of copyright infringement that are specific to Liquid Web.  Rather, the only allegations regarding copyright that could possibly relate to Liquid Web mention the "defendants" as a group without distinguishing among individual actors.  See Am. Compl. at 10, 22, 24-25.  For this reason alone, any purported copyright claim against Liquid Web should be dismissed under Fed. R. Civ. P. 8.  See Appalacian Enters., Inc. v. ePayment Solutions, Ltd., 2004 WL 2813121, at *7 (S.D.N.Y. Dec. 8, 2004) ("A plaintiff fails to satisfy [R]ule 8, where the complaint lumps all the defendants together and fails to distinguish their conduct because such allegations fail to give adequate notice to the defendants as to what they did wrong.") (citations, internal quotation marks, and alterations omitted).

In any event, even if we were to treat the references to "defendants" as references to Liquid Web, Gench's copyright claims would fail.  To state a claim for copyright infringement, a plaintiff must prove two elements: first, "ownership of a valid copyright"; and second, "copying of constituent elements of the work that are original."  E.g., Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc., 499 U.S. 340, 361 (1991)) (quotation marks omitted).  To establish the second element, a plaintiff must show, inter

alia, that the defendant "actually copied" the work.  E.g., Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001); accord Shine v. Childs, 382 F. Supp. 2d 602, 607 (S.D.N.Y. 2005).  For the purposes of the Copyright Act, "copies" are "material objects . . . in which a work is fixed by any method . . . , and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 101.  Once actual copying is established, a plaintiff must "show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works."  Laureyssens v. Idea Grp., Inc., 964 F.2d 131, 140 (2d Cir. 1992).

While the amended complaint references federal copyright law in general, see Am. Compl. at 3-5, 11-12, 22, it does not describe in any intelligible way the particular infringement that allegedly occurred, much less suggest how Liquid Web specifically committed infringement.  Gench has alleged that she registered the content of the site with the U.S. Copyright Office.  See id. at 5; Ex. 7 to Am. Compl. (certificate of registration for the "work" entitled "Online Tutor For English" and a list of its contents).  But her amended complaint does not show that Liquid Web actually copied this work or produced an infringing work itself.  Instead, Gench's copyright claim seems to be that HostGator, "[w]ith the conspiracy of Enom," Am. Compl. at 7, uploaded the site to an incorrect server under a "mask" domain name which "never reversed to Plaintiff," id. at 12; see id. at 7, 11-12.  The amended complaint alleges in a conclusory manner that this caused users to be directed to a different website that was "unaffiliated with OnlineTutorForEnglish.Com," id. at 7, allowing "criminal host(s) to steal the site content," id. at 12, and "manipulate users' web activity," id. at 7; see also id. at 24 ("[T]he plaintiff's site has fallen off into the hands of hackers.").  It also claims that this caused Gench to lose her clients' email addresses, to lose control of her email account, and to be subject to email

spam.  See id. at 9, 17, 24.

However, these allegations are too vague, conclusory, and unintelligible to allow a finding that the elements of a copyright infringement claim have been met.  The allegations seem to relate to how the site was hosted — that is, through certain servers, under certain domain names, and using certain IP addresses.  See, e.g., id. at 16 ("Liquid Web has devised additional name servers in order to conveniently orchestrate a maze of IP mapping" and "to leave out [Gench's] private name servers to the defendants"); see also id. at 6 ("Hostgator never provided a dedicated IP, resulting in a calamity of successive infringing . . . ."); id. at 7 ("Plaintiff complained to Hostgator that her name servers pointed to Softlayer.Com . . . ."); id. at 21 (Wired Tree caused the site to map to SiteGap.com because it had "not configured the server properly").  In other words, Gench seems to assume that because she perceived the defendants to have improperly hosted the site, the site's copyrighted content must necessarily have been appropriated by "criminal host(s)."  Id. at 12.

This is insufficient to state a copyright infringement claim.  There are no comprehensible allegations that any of the defendants, including Liquid Web, copied the site's content, produced an infringing work, or took any voluntary action to cause an infringing work to be produced.  See Wolk v. Kodak Imaging Network, Inc., 840 F. Supp. 2d 724, 742 (S.D.N.Y. 2012) ("Direct liability requires 'volitional conduct' that 'causes' the infringement.") (quoting Cartoon Network LP v. CAC Holdings, Inc., 536 F.3d 121, 131 (2d Cir. 2008)), aff'd, 569 F. App'x 51 (2d Cir. 2014); see also CoStar Grp., Inc. v. LoopNet, Inc., 373 F.3d 544, 549 (4th Cir. 2004) (the Copyright Act "requires conduct by a person who causes in some meaningful way an infringement") (emphasis in original).

Nor can the amended complaint be construed to raise a claim for contributory copyright

20

infringement, which arises when a defendant "intentionally induc[es] or encourag[es] direct infringement," or vicarious infringement, which occurs by "profiting from direct infringement while declining to exercise a right to stop or limit it." Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005) (citations omitted). To state a claim for contributory copyright infringement, a plaintiff must allege that a party "with knowledge of the infringing activity[] induce[d], cause[d], or materially contribut[ed] to the infringing conduct of another." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citation, quotation marks, and emphasis omitted); see Newborn v. Yahoo!, Inc., 391 F. Supp. 2d 181, 186-88 (D.D.C. 2005) (dismissing claim for contributory copyright infringement in part because of the vagueness of the allegations). To be liable for contributory copyright infringement, a defendant must have "more than a generalized knowledge . . . of the possibility of infringement." Luvdarts, LLC v. AT&T Mobility, LLC, 710 F.3d 1068, 1072 (9th Cir. 2013); see Livnat v. Lavi, 1998 WL 43221, at *3 (S.D.N.Y. Feb. 2, 1998) ("Knowledge of the infringing activity may be actual or constructive. . . . However, one who furnishes a copyrighted work to another but is innocent of any knowledge of the other party's intended illegitimate use will not be liable.") (citations omitted).

Here, the amended complaint contains no non-conclusory allegations that would support the assertion that Liquid Web knew or should have known about the alleged actions of the "criminal" third parties. Nor does it show how the "criminal" third parties engaged in copyright infringement, or how Liquid Web might have profited from any such infringement. Gench's speculation that the site has "fallen into the hands of hackers," because it does not have a "dedicated IP," Am. Compl. at 24, is insufficient to show that any person or entity appropriated her copyrighted content.

21

In sum, Gench has not stated a claim for copyright infringement against Liquid Web.[5]

D.      New York State Law False Advertising Claim

According to Gench, Liquid Web advertised a "dedicated server, dedicated IP address, 99 percent uptime, and 24/7 hours 'Heroic Support.'" Am. Compl. at 19.  She alleges that she paid for these services but did not receive them.  See id. at 8, 14-15, 19-20, 24; Pl. Third Opp'n at 11-16.  The amended complaint alleges that this constitutes false advertising under N.Y. Gen. Bus. L. §§ 350, 350-a.  See Am. Compl. at 19.

Federal courts have "supplemental jurisdiction" over state law claims if they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III."  28 U.S.C. § 1367(a).  Nonetheless, a district court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction."  Id. § 1367(c)(3); accord United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (state claims "should be dismissed" if federal claims are dismissed before trial); In re Merrill Lynch Ltd. P'ships Litig., 154 F.3d 56, 61 (2d Cir. 1998); Lennon v. Miller, 66 F.3d 416, 426 (2d Cir. 1995).  Here, all of Gench's federal claims against Liquid Web should be dismissed.  Thus, the Court should decline to exercise supplemental jurisdiction over her state law claim.

---

[5]  Gench makes other arguments in her papers that are legally frivolous and which we therefore do not discuss.  See, e.g., Pl. Third Opp'n at 5-6 (arguing that Liquid Web's motion to dismiss should be denied due to the "missing joinder"); id. at 4 (arguing that the motion should be denied because it is "not a permissive counter claim"); id. at 5 (arguing that the motion is "fraudulent"); Pl. Fourth Opp'n at 1-3 (arguing that one of Liquid Web's submissions was not docketed properly in a "fraudulent attempt to dilute the entry of plaintiff's motion"); id. at 2 (arguing that Liquid Web "has no right to file a Rule 12(b)(6) under default status").

IV.   CONCLUSION

For the foregoing reasons, Liquid Web's motions to set aside the default (Docket # 103) and to dismiss the complaint against it (Docket # 107) should be granted. All of Gench's requests for relief, including those in her "Motion Against Liquid Web," Pl. Third Opp'n (Docket # 132), and "Motion Requesting to Docket Motion 129-1," Pl. Fourth Opp'n (Docket # 133), should be denied. Because the claims against all other defendants have been dismissed, the Clerk should be requested to enter judgment dismissing the complaint.

## PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Ronnie Abrams at 40 Foley Square, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Abrams. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: June 17, 2015
    New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge